DOUGLAS et al. *v.* CITY OF JEANNETTE et al.

No. 450. Argued March 10, 11, 1943.—Decided May 3, 1943.

158

*Mr. Hayden C. Covington* for petitioners.

*Mr. Fred B. Trescher* for respondents.

Mr. Chief Justice Stone delivered the opinion of the Court.

Petitioners brought this suit in the United States District Court for Western Pennsylvania to restrain threatened criminal prosecution of them in the state courts by respondents, the City of Jeannette (a Pennsylvania municipal corporation) and its Mayor, for violation of a city ordinance which prohibits the solicitation of orders for merchandise without first procuring a license from the city authorities and paying a license tax. The ordinance as applied is held to be an unconstitutional abridgment of free speech, press and religion in *Murdock* v. *Pennsylvania, ante,* p. 105. The questions decisive of the present case are whether the district court has statutory jurisdiction as a federal court to entertain the suit, and whether petitioners have by their pleadings and proof established a cause of action in equity.

The case is not one of diversity of citizenship, since some of the petitioners, like respondents, are citizens of Pennsylvania. The bill of complaint alleges that the named plaintiffs are Jehovah's Witnesses, persons who entertain religious beliefs and engage in religious practices which it describes; that the suit is a class suit brought in petitioners' own behalf and in behalf of all other Jehovah's Witnesses in Pennsylvania and adjoining states to restrain respondents from enforcing ordinance No. 60 of the City of Jeannette against petitioners and all other Jehovah's Witnesses because, as applied to them, the ordinance abridges the guaranties of freedom of speech, press, and religion of the First Amendment made applicable to the states by the Fourteenth.

The suit is alleged to arise under the Constitution and laws of the United States, including the Civil Rights Act of 1871. The complaint sets up that in the practice of their religion and in conformity to the teachings of the Bible, Jehovah's Witnesses make, and for many years have made, house to house distribution, among the people of the City of Jeannette, of certain printed books and pamphlets setting forth the Jehovah's Witnesses' interpretations of the teachings of the Bible. Municipal Ordinance No. 60 provides: "That all persons canvassing for or soliciting within said Borough (now City of Jeannette), orders for goods . . . wares or merchandise of any kind, or persons delivering such articles under orders so obtained or solicited" without first procuring a license and paying prescribed license taxes, shall be punished by fine not exceeding $100 and costs, or if the fine is not paid, by imprisonment from five to thirty days. It is alleged that in April, 1939, respondents arrested and prosecuted petitioners and other Jehovah's Witnesses for violation of the ordinance because of their described activities in distributing religious literature, without the permits required by the ordinance, and that respondents threaten to continue to enforce the ordinance by arrests and prosecutions—all in violation of petitioners' civil rights.

No preliminary or interlocutory injunction was granted but the district court, after a trial, held the ordinance invalid, 39 F. Supp. 32, on the authority of *Reid* v. *Borough of Brookville,* 39 F. Supp. 30, in that it deprived petitioners of the rights of freedom of press and religion guaranteed by the First and Fourteenth Amendments. The court enjoined respondents from enforcing the ordinance against petitioners and other Jehovah's Witnesses.

The Court of Appeals for the Third Circuit sustained the jurisdiction of the district court, but reversed on the merits, 130 F. 2d 652, on the authority of *Jones* v. *Opelika,* 316 U. S. 584. One judge dissented on the ground that the complaint did not sufficiently allege a violation

of the Due Process Clause of the Fourteenth Amendment so as to entitle petitioners to relief under the Civil Rights Act. We granted certiorari, 318 U. S. 749, and set the case for argument with *Murdock* v. *Pennsylvania, supra.*

We think it plain that the district court had jurisdiction as a federal court to hear and decide the question of the constitutional validity of the ordinance, although there was no allegation or proof that the matter in controversy exceeded $3,000. By 8 U. S. C. § 43 (derived from § 1 of the Civil Rights Act of April 20, 1871, 17 Stat. 13, continued without substantial change as R. S. § 1979) it is provided that "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

As we held in *Hague* v. *C. I. O.*, 307 U. S. 496, 507–14, 527–32, the district courts of the United States are given jurisdiction by 28 U. S. C. § 41 (14) over suits brought under the Civil Rights Act without the allegation or proof of any jurisdictional amount. Not only do petitioners allege that the present suit was brought under the Civil Rights Act, but their allegations plainly set out an infringement of its provisions. In substance, the complaint alleges that respondents, proceeding under the challenged ordinance, by arrest, detention and by criminal prosecutions of petitioners and other Jehovah's Witnesses, had subjected them to deprivation of their rights of freedom of speech, press and religion secured by the Constitution, and the complaint seeks equitable relief from such deprivation in the future.

The particular provision of the Constitution on which petitioners rely is the Due Process Clause of the Four-

teenth Amendment, violation of which the dissenting judge below thought was not sufficiently alleged to establish a basis for relief under the Civil Rights Act. But we think this overlooks the special relationship of the Fourteenth Amendment to the rights of freedom of speech, press, and religion guaranteed by the First. We have repeatedly held that the Fourteenth Amendment has made applicable to the states the guaranties of the First. *Schneider* v. *State*, 308 U. S. 147, 160, n. 8 and cases cited; *Jamison* v. *Texas*, 318 U. S. 413. Allegations of fact sufficient to show deprivation of the right of free speech under the First Amendment are sufficient to establish deprivation of a constitutional right guaranteed by the Fourteenth, and to state a cause of action under the Civil Rights Act, whenever it appears that the abridgment of the right is effected under color of a state statute or ordinance. It follows that the bill, which amply alleges the facts relied on to show the abridgment by criminal proceedings under the ordinance, sets out a case or controversy which is within the adjudicatory power of the district court.

Notwithstanding the authority of the district court, as a federal court, to hear and dispose of the case, petitioners are entitled to the relief prayed only if they establish a cause of action in equity. Want of equity jurisdiction, while not going to the power of the court to decide the cause, *Di Giovanni* v. *Camden Ins. Assn.*, 296 U. S. 64, 69; *Pennsylvania* v. *Williams*, 294 U. S. 176, 181–82, may nevertheless, in the discretion of the court, be objected to on its own motion. *Twist* v. *Prairie Oil Co.*, 274 U. S. 684, 690; *Pennsylvania* v. *Williams, supra,* 185. Especially should it do so where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court.

The power reserved to the states under the Constitution to provide for the determination of controversies in

their courts may be restricted by federal district courts only in obedience to Congressional legislation in conformity to the judiciary Article of the Constitution. Congress, by its legislation, has adopted the policy, with certain well defined statutory exceptions, of leaving generally to the state courts the trial of criminal cases arising under state laws, subject to review by this Court of any federal questions involved. Hence, courts of equity in the exercise of their .discretionary powers should conform to this policy by refusing to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent; and equitable remedies infringing this independence of the states—though they might otherwise be given—should be withheld if sought on slight or inconsequential grounds. *Di Giovanni* v. *Camden Ins. Assn., supra,* 73; *Matthews* v. *Rodgers,* 284 U. S. 521, 525–26; cf. *United States ex rel. Kennedy* v. *Tyler,* 269 U. S. 13; *Massachusetts State Grange* v. *Benton,* 272 U. S. 525.

It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction. *Davis & Farnum Mfg. Co.* v. *Los Angeles,* 189 U. S. 207; *Fenner* v. *Boykin,* 271 U. S. 240. Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the

164

states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury "both great and immediate." *Spielman Motor Co.* v. *Dodge,* 295 U. S. 89, 95, and cases cited; *Beal* v. *Missouri Pacific R. Corp.,* 312 U. S. 45, 49, and cases cited; *Watson* v. *Buck,* 313 U. S. 387; *Williams* v. *Miller,* 317 U. S. 599.

The trial court found that respondents had prosecuted certain of petitioners and other Jehovah's Witnesses for distributing the literature described in the complaint without having obtained the license required by the ordinance, and had declared their intention further to enforce the ordinance against petitioners and other Jehovah's Witnesses. But the court made no finding of threatened irreparable injury to petitioners or others, and we cannot say that the declared intention to institute other prosecutions is sufficient to establish irreparable injury in the circumstances of this case.

Before the present suit was begun, convictions had been obtained in the state courts in cases Nos. 480–487, *Murdock et al.* v. *Pennsylvania, supra,* which were then pending on appeal and which were brought to this Court for review by certiorari contemporaneously with the present case. It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, or that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court. In these respects the case differs from *Hague* v. *C. I. O., supra,* 501–02, where local officials forcibly broke up meetings of the complainants and in many instances forcibly deported them from the state without trial.

There is no allegation here and no proof that respondents would not, nor can we assume that they will not, acquiesce in the decision of this Court holding the challenged ordinance unconstitutional as applied to petitioners. If the ordinance had been held constitutional, petitioners could not complain of penalties which would have been but the consequence of their violation of a valid state law.

Nor is it enough to justify the exercise of the equity jurisdiction in the circumstances of this case that there are numerous members of a class threatened with prosecution for violation of the ordinance. In general the jurisdiction of equity to avoid multiplicity of civil suits at law is restricted to those cases where there would otherwise be some necessity for the maintenance of numerous suits between the same parties involving the same issues of law or fact. It does not ordinarily extend to cases where there are numerous parties and the issues between them and the adverse party—here the state—are not necessarily identical. *Matthews* v. *Rodgers, supra,* 529–30, and cases cited. Far less should a federal court of equity attempt to envisage in advance all the diverse issues which could engage the attention of state courts in prosecutions of Jehovah's Witnesses for violations of the present ordinance, or assume to draw to a federal court the determination of those issues in advance, by a decree saying in what circumstances and conditions the application of the city ordinance will be deemed to abridge freedom of speech and religion.

In any event, an injuction looks to the future. *Texas Co.* v. *Brown,* 258 U. S. 466, 474; *Standard Oil Co.* v. *United States,* 283 U. S. 163, 182. And in view of the decision rendered today in *Murdock* v. *Pennsylvania, supra,* we find no ground for supposing that the intervention of a federal court, in order to secure petitioners' constitutional rights, will be either necessary or appropriate.

For these reasons, establishing the want of equity in the cause, we affirm the judgment of the circuit court of appeals directing that the bill be dismissed.

*Affirmed.*

MR. JUSTICE JACKSON, concurring in the result in this case and dissenting in Nos. 480–487, *Murdock* v. *Pennsylvania, ante,* p. 105, and No. 238, *Martin* v. *Struthers, ante,* p. 141:

Except the case of *Douglas et al.* v. *Jeannette,* all of these cases are decided upon the record of isolated prosecutions in which information is confined to a particular act of offense and to the behavior of an individual offender. Only the *Douglas* record gives a comprehensive story of the broad plan of campaign employed by Jehovah's Witnesses and its full impact on a living community. But the facts of this case are passed over as irrelevant to the theory on which the Court would decide its particular issue. Unless we are to reach judgments as did Plato's men who were chained in a cave so that they saw nothing but shadows, we should consider the facts of the *Douglas* case at least as an hypothesis to test the validity of the conclusions in the other cases. This record shows us something of the strings as well as the marionettes. It reveals the problem of those in local authority when the right to proselyte comes in contact with what many people have an idea is their right to be let alone. The Chief Justice says for the Court in *Douglas* that "in view of the decision rendered today in *Murdock* v. *Pennsylvania, supra,* we find no ground for supposing that the intervention of a federal court, in order to secure petitioners' constitutional rights, will be either necessary or appropriate," which could hardly be said if the constitutional issues presented by the facts of this case are not settled by the *Murdock* case. The facts of record in the *Douglas* case and their relation to the facts of the other cases seem to

me worth recital and consideration if we are realistically to weigh the conflicting claims of rights in the related cases today decided.

From the record in *Douglas* we learn:

In 1939, a "Watch Tower Campaign" was instituted by Jehovah's Witnesses in Jeannette, Pennsylvania, an industrial city of some 16,000 inhabitants.[1] Each home was visited, a bell was rung or the door knocked upon, and the householder advised that the Witness had important information. If the householder would listen, a record was played on the phonograph. Its subject was "Snare and Racket." The following words are representative of its contents: "Religion is wrong and a snare because it deceives the people, but that does not mean that all who follow religion are willingly bad. Religion is a racket because it has long been used and is still used to extract money from the people upon the theory and promise that the paying over of money to a priest will serve to relieve the party paying from punishment after death and further insure his salvation." This line of attack is taken by the Witnesses generally upon all denominations, especially the Roman Catholic. The householder was asked to buy a variety of literature for a price or contribution. The

---

[1] Sixteenth Annual Census of the United States (1940), Population, Volume I (Census Bureau of the United States Department of Commerce) p. 922. The City of Jeannette is included in Westmoreland County, shown by the 1940 Census to have a population of 303,411, an increase over 1930 and 1920. *Ibid.* The 1936 Census of Religious Bodies shows that of the people in Westmoreland County 168,608 were affiliated with some religious body, 80,276 of them with the Roman Catholic Church. Census of Religious Bodies (1936), Volume I (Census Bureau of the United States Department of Commerce) pp. 809–814. According to unpublished information in the files of the Census Bureau, the 1936 Census of Religious Bodies shows that there were in the City of Jeannette 5,520 Roman Catholics. Thus it appears that the percentage of Catholics in the City is somewhat higher than in the County as a whole.

price would be twenty-five cents for the books and smaller sums for the pamphlets. Oftentimes, if he was unwilling to purchase, the book or pamphlet was given to him anyway.

When this campaign began, many complaints from offended householders were received, and three or four of the Witnesses were arrested. Thereafter, the "zone servant" in charge of the campaign conferred with the Mayor. He told the Mayor it was their right to carry on the campaign and showed him a decision of the United States Supreme Court, said to have that effect, as proof of it. The Mayor told him that they were at liberty to distribute their literature in the streets of the city and that he would have no objection if they distributed the literature free of charge at the houses, but that the people objected to their attempt to force these sales, and particularly on Sunday. The Mayor asked whether it would not be possible to come on some other day and to distribute the literature without selling it. The zone servant replied that that was contrary to their method of "doing business" and refused. He also told the Mayor that he would bring enough Witnesses into the City of Jeannette to get the job done whether the Mayor liked it or not. The Mayor urged them to await the outcome of an appeal which was then pending in the other cases and let the matter take its course through the courts. This, too, was refused, and the threat to bring more people than the Mayor's police force could cope with was repeated.

On Palm Sunday of 1939, the threat was made good. Over 100 of the Witnesses appeared. They were strangers to the city and arrived in upwards of twenty-five automobiles. The automobiles were parked outside the city limits, and headquarters were set up in a gasoline station with telephone facilities through which the director of the campaign could be notified when trouble occurred. He furnished bonds for the Witnesses as they were arrested.

As they began their work, around 9:00 o'clock in the morning, telephone calls began to come in to the Police Headquarters, and complaints in large volume were made all during the day. They exceeded the number that the police could handle, and the Fire Department was called out to assist. The Witnesses called at homes singly and in groups, and some of the homes complained that they were called upon several times. Twenty-one Witnesses were arrested. Only those were arrested where definite proof was obtainable that the literature had been offered for sale or a sale had been made for a price. Three were later discharged for inadequacies in this proof, and eighteen were convicted. The zone servant furnished appeal bonds.

The national structure of the Jehovah's Witness movement is also somewhat revealed in this testimony. At the head of the movement in this country is the Watch Tower Bible & Tract Society, a corporation organized under the laws of Pennsylvania, but having its principal place of business in Brooklyn, N. Y. It prints all pamphlets, manufactures all books, supplies all phonographs and records, and provides other materials for the Witnesses. It "ordains" these Witnesses by furnishing each, on a basis which does not clearly appear, a certificate that he is a minister of the Gospel. Its output is large and its revenues must be considerable. Little is revealed of its affairs. One of its "zone servants" testified that its correspondence is signed only with the name of the corporation and anonymity as to its personnel is its policy. The assumption that it is a "non-profit charitable" corporation may be true, but it is without support beyond mere assertion. In none of these cases has the assertion been supported by such usual evidence as a balance sheet or an income statement. What its manufacturing costs and revenues are, what salaries or bonuses it pays, what contracts it has for supplies or services we simply do not

know. The effort of counsel for Jeannette to obtain information, books and records of the local "companies" of Witnesses engaged in the Jeannette campaign in the trial was met by contradictory statements as to the methods and meaning of such meager accounts as were produced.

The publishing output of the Watch Tower corporation is disposed of through converts, some of whom are full-time and some part-time ministers. These are organized into groups or companies under the direction of "zone servants." It is their purpose to carry on in a thorough manner so that every home in the communities in which they work may be regularly visited three or four times a year. The full-time Witnesses acquire their literature from the Watch Tower Bible & Tract Society at a figure which enables them to distribute it at the prices printed thereon with a substantial differential. Some of the books they acquire for 5¢ and dispose of for a contribution of 25¢. On others, the margin is less. Part-time ministers have a differential between the 20¢ which they remit to the Watch Tower Society and the 25¢ which is the contribution they ask for the books. We are told that many of the Witnesses give away a substantial quantity of the literature to people who make no contributions. Apart from the fact that this differential exists and that it enables the distributors to meet in whole or in part their living expenses, it has proven impossible in these cases to learn the exact results of the campaigns from a financial point of view. There is evidence that the group accumulated a substantial amount from the differentials, but the tracing of the money was not possible because of the failure to obtain records and the failure, apparently, to keep them.

The literature thus distributed is voluminous and repetitious. Characterization is risky, but a few quotations will indicate something of its temper.

Taking as representative the book "Enemies," of which J. F. Rutherford, the lawyer who long headed this group,

is the author, we find the following: "The greatest racket ever invented and practiced is that of religion. The most cruel and seductive public enemy is that which employs religion to carry on the racket, and by which means the people are deceived and the name of Almighty God is reproached. There are numerous systems of religion, but the most subtle, fraudulent and injurious to humankind is that which is generally labeled the 'Christian religion,' because it has the appearance of a worshipful devotion to the Supreme Being, and thereby easily misleads many honest and sincere persons." *Id.* at 144–145. It analyzes the income of the Roman Catholic hierarchy and announces that it is "the great racket, a racket that is greater than all other rackets combined." *Id.* at 178. It also says under the chapter heading "Song of the Harlot," "Referring now to the foregoing Scriptural definition of *harlot:* What religious system exactly fits the prophecies recorded in God's Word? There is but one answer, and that is, The Roman Catholic Church organization." *Id.* at 204–205. "Those close or nearby and dependent upon the main organization, being of the same stripe, picture the Jewish and Protestant clergy and other allies of the Hierarchy who tag along behind the Hierarchy at the present time to do the bidding of the old 'whore'." *Id.* at 222. "Says the prophet of Jehovah: 'It shall come to pass in that day, that Tyre (modern Tyre, the Roman Catholic Hierarchy organization) shall be forgotten.' Forgotten by whom? By her former illicit paramours who have committed fornication with her." *Id.* at 264. Throughout the literature, statements of this kind appear amidst scriptural comment and prophecy, denunciation of demonology, which is used to characterize the Roman Catholic religion, criticism of government and those in authority, advocacy of obedience to the law of God instead of the law of man, and an interpretation of the law of God as they see it.

The spirit and temper of this campaign is most fairly stated perhaps in the words, again of Rutherford, in his book "Religion," pp. 196–198:

"God's faithful servants go from house to house to bring the message of the kingdom to those who reside there, omitting none, not even the houses of the Roman Catholic Hierarchy, and there they give witness to the kingdom because they are commanded by the Most High to do so. 'They shall enter in at the windows like a thief.' They do not loot nor break into the houses, but they set up their phonographs before the doors and windows and send the message of the kingdom right into the houses into the ears of those who might wish to hear; and while those desiring to hear are hearing, some of the 'sourpusses' are compelled to hear. Locusts invade the homes of the people and even eat the varnish off the wood and eat the wood to some extent. Likewise God's faithful witnesses, likened unto locusts, get the kingdom message right into the house and they take the veneer off the religious things that are in that house, including candles and 'holy water', remove the superstition from the minds of the people, and show them that the doctrines that have been taught to them are wood, hay and stubble, destructible by fire, and they cannot withstand the heat. The people are enabled to learn that 'purgatory' is a bogeyman, set up by the agents of Satan to frighten the people into the religious organizations, where they may be fleeced of their hard-earned money. Thus the kingdom message plagues the religionists, and the clergy find that they are unable to prevent it. Therefore, as described by the prophet, the message comes to them like a thief that enters in at the windows, and this message is a warning to those who are on the inside that Jesus Christ has come, and they remember his warning words, to wit: 'Behold, I come as a thief.' (Revelation 16: 15.) The day of

Armageddon is very close, and that day comes upon the world in general like a thief in the night."

The day of Armageddon, to which all of this is prelude, is to be a violent and bloody one, for then shall be slain all "demonologists," including most of those who reject the teachings of Jehovah's Witnesses.

In the *Murdock* case, on another Sunday morning of the following Lent, we again find the Witnesses in Jeannette, travelling by twos and threes and carrying cases for the books and phonographs. This time eight were arrested, as against the 21 arrested on the preceding Palm Sunday involved in the *Douglas* case.

In the *Struthers* case, we find the Witness knocking on the door of a total stranger at 4:00 on Sunday afternoon, July 7th. The householder's fourteen year old son answered, and, at the Witness's request, called his mother from the kitchen. His mother had previously become "very much disgusted about going to the door" to receive leaflets, particularly since another person had on a previous occasion called her to the door and told her, as she testified, "that I was doomed to go to hell because I would not let this literature in my home for my children to read." She testified that the Witness "shoved in the door" the circular being distributed,[2] and that she

---

[2] This reads as follows:

"RELIGION as a WORLD REMEDY, The Evidence in Support Thereof. Hear JUDGE RUTHERFORD, Sunday, July 28, 4 P. M., E. S. T. FREE, All Persons of Goodwill Welcome, FREE. Columbus Coliseum, Ohio State Fair Grounds." [On one side.]

"1940's Event of Paramount Importance To You! What is it? The THEOCRATIC CONVENTION of JEHOVAH'S WITNESSES. Five Days—July 24–28—Thirty Cities. All Lovers of Righteousness— Welcome! The strange fate threatening all 'Christendom' makes it imperative that you COME and HEAR the public address on RELIGION As A WORLD REMEDY, The Evidence in Support Thereof, by Judge Rutherford at the COLISEUM of the OHIO STATE FAIR GROUNDS, Co-

"couldn't do much more than take" it, and she promptly tore it up in the presence of the Witness, for while she believed "in the worship of God," she did not "care to talk to everybody" and did not "believe that anyone needs to be sent from door to door to tell us how to worship." The record in the *Struthers* case is even more sparse than that in the *Murdock* case, but the householder did testify that at the time she was given the circular the Witness "told me that a number of them were in jail and would I call the Chief of Police and ask that their workers might be released."

Such is the activity which it is claimed no public authority can either regulate or tax. This claim is substantially, if not quite, sustained today. I dissent—a disagreement induced in no small part by the facts recited.

As individuals many of us would not find this activity seriously objectionable. The subject of the disputes involved may be a matter of indifference to our personal creeds. Moreover, we work in offices affording ample shelter from such importunities and live in homes where we do not personally answer such calls and bear the burden of turning away the unwelcome. But these observations do not hold true for all. The stubborn persistence of the officials of smaller communities in their efforts to regulate this conduct indicates a strongly held conviction that the Court's many decisions in this field are at odds with the realities of life in those communities where the householder himself drops whatever he may be doing to

---

lumbus, Ohio, Sunday, July 28, at 4 p. m., E. S. T. 'He that hath an ear to hear' will come to one of the auditoriums of the convention cities listed below, tied in with Columbus by direct wire. Some of the 30 cities are . . . [21 are listed]. For detailed information concerning these conventions write WATCHTOWER CONVENTION COMMITTEE, 117 Adams St., Brooklyn, N. Y." [On the other side.]

answer the summons to the door and is apt to have positive religious convictions of his own.[3]

Three subjects discussed in the opinions in *Murdock* v. *Pennsylvania* and *Martin* v. *Struthers* tend to obscure the effect of the decisions. The first of these relates to the form of the ordinances in question. One cannot determine whether this is mere makeweight or whether it is an argument addressed to the constitutionality of the ordinances; and whatever it is, I cannot reconcile the treatment of the subject by the two opinions. In *Murdock* the Court says "the present ordinance is not narrowly drawn to safeguard the people of the community in their homes against the evils of solicitations," and again "the ordinance is not narrowly drawn to prevent or control abuses or evils arising from" solicitation from house to house. It follows the recent tendency to invalidate ordinances in this general field that are not "narrowly drawn."

But in *Struthers* the ordinance is certainly narrowly drawn. Yet the Court denies the householder the narrow protection it gives. The city points out that this ordinance was narrowly drawn to meet a particular evil in that community where many men must work nights and rest by day. I had supposed that our question, except in respect to ordinances invalid on their face, is always whether the ordinance as applied denies constitutional rights.. Nothing in the Constitution says or implies that real rights are more vulnerable to a narrow ordinance

---

[3] Compare Chafee, Freedom of Speech in the United States (1941) p. 407: "I cannot help wondering whether the Justices of the Supreme Court are quite aware of the effect of organized front-door intrusions upon people who are not sheltered from zealots and impostors by a staff of servants or the locked entrance of an apartment house."

than to a broad one. I think our function is to take municipal ordinances as they are construed by the state courts and applied by local authorities and to decide their constitutionality accordingly, rather than to undertake censoring their draftsmanship.

Secondly, in neither opinion does the Court give clearcut consideration to the particular activities claimed to be entitled to constitutional immunity, but in one case blends with them conduct of others not in question, and in the other confuses with the rights in question here certain alleged rights of others which these petitioners are in no position to assert as their own.

In the *Murdock* case, the Court decides to "restore to their high, constitutional position the liberties of itinerant evangelists." That it does without stating what those privileges are, beyond declaring that "This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." How can we dispose of the questions in this case merely by citing the unquestioned right to minister to congregations voluntarily attending services?

Similarly, in the *Struthers* case the Court fails to deal with the behavior of the Witnesses on its own merits. It reaches its decision by weighing against the ordinance there in question not only the rights of the Witness but also "the right of the individual householder to determine whether he is willing to receive her message"; concludes that the ordinance "substitutes the judgment of the community for the judgment of the individual householder"; and decides the case on the basis that "it submits the distributer to criminal punishment for annoying the person on whom he calls, even though the recipient of the literature distributed is in fact glad to receive it." But the hospitable householder thus thrown in the balance with the Witness to make weight against the city ordinance is wholly hypothetical and the assumption is contrary to

the evidence we have recited. Doubtless there exist fellow spirits who welcome these callers, but the issue here is what are the rights of those who do not and what is the right of the community to protect them in the exercise of their own faith in peace. That issue—the real issue—seems not to be dealt with.

Third, both opinions suggest that there are evils in this conduct that a municipality may do something about. But neither identifies it, nor lays down any workable guide in so doing. In *Murdock* the Court says that "the ordinance is not narrowly drawn to prevent or control abuses or evils arising" from house-to-house solicitation. What evils or abuses? It is also said in *Murdock* that we "have something very different from a registration system under which those going from house to house are required to give their names, addresses and other marks of identification to the authorities." What more? The fee of course. But we are told the fee is not "a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." Is it implied that such a registration for such a fee would be valid? Wherein does the suggestion differ from the ordinance we are striking down? This ordinance did nothing more, it did not give discretion to refuse the license nor to censor the literature. The fee ranged from $1.50 a day for one day to less than a dollar a day for two weeks. There is not a syllable of evidence that this amount exceeds the cost to the community of policing this activity. If this suggestion of new devices is not illusory, why is the present ordinance invalid? The City of Struthers decided merely that one with no more business at a home than the delivery of advertising matter should not obtrude himself farther by announcing the fact of delivery. He was free to make the distribution if he left the householder undisturbed, to take it in in his own time. The Court says the City has not even this much leeway in ordering

its affairs, however complicated they may be as the re-
sult of round-the-clock industrial activity. If the local
authorities must draw closer aim at evils than they did
in these cases I doubt that they ever can hit them. What
narrow area of regulation exists under these decisions?
The *Struthers* opinion says, "the dangers of distribution
can so easily be controlled by traditional legal methods."
It suggests that the City may "by identification devices
control the abuse of the privilege by criminals posing as
canvassers." Of course to require registration and license
is one of the few practical "identification devices."
Merely giving one's name and his address to the authori-
ties would afford them basis for investigating who the
strange callers are and what their record has been. And
that is what *Murdock* prohibits the city from asking. If
the entire course of concerted conduct revealed to us is
immune, I should think it neither fair nor wise to throw
out to the cities encouragement to try new restraints. If
some part of it passes the boundary of immunity, I think
we should say what part and why in these cases we are
denying the right to regulate it. The suggestion in
*Struthers* that "the problem must be worked out by each
community for itself" is somewhat ironical in view of the
fate of the ordinances here involved.

Our difference of opinion cannot fairly be given the color
of a disagreement as to whether the constitutional rights
of Jehovah's Witnesses should be protected in so far as
they are rights. These Witnesses, in common with all
others, have extensive rights to proselyte and propagan-
dize. These of course include the right to oppose and
criticize the Roman Catholic Church or any other denom-
ination. These rights are, and should be held to be, as
extensive as any orderly society can tolerate in religious
disputation. The real question is where their rights end
and the rights of others begin. The real task of deter-
mining the extent of their rights on balance with the rights

of others is not met by pronouncement of general propositions with which there is no disagreement.

If we should strip these cases to the underlying questions, I find them too difficult as constitutional problems to be disposed of by a vague but fervent transcendentalism.

In my view, the First Amendment assures the broadest tolerable exercise of free speech, free press, and free assembly, not merely for religious purposes, but for political, economic, scientific, news, or informational ends as well. When limits are reached which such communications must observe, can one go farther under the cloak of religious evangelism? Does what is obscene, or commercial, or abusive, or inciting become less so if employed to promote a religious ideology? I had not supposed that the rights of secular and non-religious communications were more narrow or in any way inferior to those of avowed religious groups.

It may be asked why then does the First Amendment separately mention free exercise of religion? The history of religious persecution gives the answer. Religion needed specific protection because it was subject to attack from a separate quarter. It was often claimed that one was an heretic and guilty of blasphemy because he failed to conform in mere belief or in support of prevailing institutions and theology. It was to assure religious teaching as much freedom as secular discussion, rather than to assure it greater license, that led to its separate statement.

The First Amendment grew out of an experience which taught that society cannot trust the conscience of a majority to keep its religious zeal within the limits that a free society can tolerate. I do not think it any more intended to leave the conscience of a minority to fix its limits. Civil government can not let any group ride rough-shod over others simply because their "consciences" tell them to do so.

A common-sense test as to whether the Court has struck a proper balance of these rights is to ask what the effect would be if the right given to these Witnesses should be exercised by all sects and denominations. If each competing sect in the United States went after the householder by the same methods, I should think it intolerable. If a minority can put on this kind of drive in a community, what can a majority resorting to the same tactics do to individuals and minorities? Can we give to one sect a privilege that we could not give to all, merely in the hope that most of them will not resort to it? Religious freedom in the long run does not come from this kind of license to each sect to fix its own limits, but comes of hardheaded fixing of those limits by neutral authority with an eye to the widest freedom to proselyte compatible with the freedom of those subject to proselyting pressures.

I cannot accept the holding in the *Murdock* case that the behavior revealed here "occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." To put them on the same constitutional plane seems to me to have a dangerous tendency towards discrediting religious freedom.

Neither can I think it an essential part of freedom that religious differences be aired in language that is obscene, abusive, or inciting to retaliation. We have held that a Jehovah's Witness may not call a public officer a "God damned racketeer" and a "damned Fascist," because that is to use "fighting words," and such are not privileged. *Chaplinsky* v. *New Hampshire*, 315 U. S. 568. How then can the Court today hold it a "high constitutional privilege" to go to homes, including those of devout Catholics on Palm Sunday morning, and thrust upon them literature calling their church a "whore" and their faith a "racket"? [4]

---

[4] Compare *Valentine* v. *Chrestensen*, 316 U. S. 52, permitting a ban on distribution of a handbill containing a civic appeal on one side and a commercial advertisement on the other.

. Nor am I convinced that we can have freedom of religion only by denying the American's deep-seated conviction that his home is a refuge from the pulling and hauling of the market place and the street. For a stranger to corner a man in his home, summon him to the door and put him in the position either of arguing his religion or of ordering one of unknown disposition to leave is a questionable use of religious freedom.[5]

I find it impossible to believe that the *Struthers* case can be solved by reference to the statement that "The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." I doubt if only the slothfully ignorant wish repose in their homes, or that the forefathers intended to open the door to such forced "enlightenment" as we have here.

In these cases, local authorities caught between the offended householders and the drive of the Witnesses, have been hard put to keep the peace of their communities. They have invoked old ordinances that are crude and clumsy for the purpose. I should think that the singular persistence of the turmoil about Jehovah's Witnesses, one which seems to result from the work of no other sect, would suggest to this Court a thorough examination of their methods to see if they impinge unduly on the rights of others. Instead of that the Court has, in one way after another, tied the hands of all local authority and made the aggressive methods of this group the law of the land.

This Court is forever adding new stories to the temples of constitutional law, and the temples have a way of collapsing when one story too many is added. So it was with liberty of contract, which was discredited by being overdone. The Court is adding a new privilege to over-

---

[5] See Chafee, *supra* footnote 3, pp. 406–407.

ride the rights of others to what has before been regarded as religious liberty. In so doing it needlessly creates a risk of discrediting a wise provision of our Constitution which protects all—those in homes as well as those out of them—in the peaceful, orderly practice of the religion of their choice but which gives no right to force it upon others.

Civil liberties had their origin and must find their ultimate guaranty in the faith of the people. If that faith should be lost, five or nine men in Washington could not long supply its want. Therefore we must do our utmost to make clear and easily understandable the reasons for deciding these cases as we do. Forthright observance of rights presupposes their forthright definition.

I think that the majority has failed in this duty. I therefore dissent in *Murdock* and *Struthers* and concur in the result in *Douglas.*

I join in the opinions of MR. JUSTICE REED in *Murdock* and *Struthers,* and in that of MR. JUSTICE FRANKFURTER in *Murdock.*

MR. JUSTICE FRANKFURTER joins in these views.