David **BROCK**, Charlotte Creech, Daniel De Garcia, Bernard J. Harity, Greene Johnston IV, Frederick Lacey, Jr., Anna May Lundy, Michael John Pazon, and Gerald Weinert, Plaintiffs,

v.

Honorable Victor Hugo **SCHIRO**, individually and as Mayor of the City of New Orleans, and Alvin J. Liska, individually and as City Attorney for the City of New Orleans, and Joseph I. Giarrusso, individually and as Superintendent of Police of the City of New Orleans, Defendants.

Civ. A. No. 66–716.

United States District Court
E. D. Louisiana,
New Orleans Division.
Feb. 10, 1967.

Smith, Waltzer & Jones, Bruce C. Waltzer, Donald Juneau, New Orleans, La., for plaintiffs.

Alvin Liska, City Atty., Beuker F. Amann, Asst. City Atty., New Orleans, La., for defendants.

CASSIBRY, District Judge.

Petitioners were arrested by New Orleans Police and charged with violating certain City Ordinances.[1] They seek to

---

1. New Orleans City Code 572 (1956) Ordinance No. 828, M.C.S.
Section 42–22, Disturbance by intoxication or otherwise:
No person shall make a violent noise or create a disturbance or offense against the public peace by intoxication or otherwise.
New Orleans City Code 592, 592.1 (1956) Ordinance No. 828 M.C.S.

Section 42–85, Vagrants—Definition and Punishment.
THE FOLLOWING PERSONS SHALL BE GUILTY OF VAGRANCY:
* * * * *
(5) Able-bodied persons without lawful means of support who do not seek employment and take employment when it is available to them;
* * * * *

enjoin the defendants from enforcing the Ordinances and from "harassing, intimidating, hindering and preventing [complainants] or their friends from exercising the rights, privileges and immunities guaranteed them by the Constitution and laws of the United States." Plaintiffs further pray that a declaratory judgment issue holding the aforementioned Ordinances unconstitutional on their face. Plaintiffs allege that defendants under color of the Ordinances have together entered into a plan or conspiracy among themselves and other persons to subject or cause complainants to be subjected to the deprivation of rights, privileges and immunities secured to them by the Constitution and laws of the United States. Plaintiffs allege that pursuant to this conspiracy, the defendants have "attempted to and continue to attempt to prosecute the individual complainants under color and authority" of the aforementioned Ordinances.

Three separate arrests were involved. Two were made in New Orleans' Jackson Square (a New Orleans public park consisting of one city block) and the other was made adjacent to or upon a street in a New Orleans public housing project. Complainants Johnston and Weinert were arrested on October 2, 1966 and charged under the New Orleans City Code, §§ 42–85, par. 5 and 42–90.[2] Brock, Creech, de Garcia, Harity, Johnston, Lundy and Pazon were arrested on October 30, 1966 and charged with violating New Orleans City Code §§ 42–22, 28–18 and 42–90.[3] On March 7, 1966, plaintiff Lacey was arrested and charged with violating New Orleans City Code § 42–85, par. 5.[4] Plaintiffs attack §§ 42–85, par. 5, and 42–90, claiming that they are

and upon conviction shall be fined not more than one hundred dollars, or imprisoned for not more than sixty days or both; provided, that any person who shall fail to pay the fine assessed against him under this section shall be condemned to imprisonment for an additional thirty days. M.C.S., Ord. No. 1436, & 1; M. C.S., Ord. No. 2965, & 1, 11–12–64) New Orleans City Code 593–4 (1956) Ordinance No. 828, M.C.S.
Section 42–90. Same [Vagrants]—Idle persons; loiterers, prostitutes, etc.
Any
(1) Person, being able, either wholly or in part, to maintain himself and his family by work or other means and wilfully refuses or neglects to do so;
(2) Idle person who, not having visible means to maintain himself, lives without employment;
(3) Person who, after having been directed by any officer or member of the police force to move away, shall remain or loiter in front of or in the neighborhood of any church or other place of public worship during the service therein or while the members of its congregation are repairing to or returning from such church or other place of public worship;
(4) Person who, after having been directed by any officer or member of the police force to move away, shall remain or loiter in front of or in the neighborhood of any theatre, concert hall, ballroom or other place of public amusement during the time that such place shall remain open to the public or while the public are repairing thereto or returning therefrom;
(5) Person who, after having been directed by any officer or member of the police force to move away, shall remain or loiter in front of or in the neighborhood of any coffeehouse, barroom, or beer saloon situated within the limits of the city;
(6) Person who shall, without legitimate business thereat, remain, loiter, or idle his time on the sidewalks or public streets or places within the limits of the city after having been notified to move therefrom by any officer or member of the police force;
(7) Common prostitute wandering in the public streets or public highways or in any place of public resort and behaving in a riotous or indecent manner;
(8) Habitual drunkard who shall abandon his family or shall refuse or neglect to aid in the support of his family.
Shall be deemed an idle and disorderly person and, upon conviction thereof, shall be punished by a fine of not more than one hundred dollars or by imprisonment for any time not less than thirty days, or both, at the discretion of the court. (Code 1956, & 42–90; M.C.S., Ord. No. 1029, & 1)

2. Note 1, supra.

3. Note 1, supra.

4. Note 1, supra.

unconstitutional on their face and as applied to Johnston, Weinert and Lacey, violate fundamental guarantees of speech, association, peaceable assembly and due process in that they are vague and fail to meet the test of certainty demanded of criminal and penal statutes. Plaintiffs further allege that these Ordinances constitute cruel and unusual punishment because they penalize a mere property status, mode of dress and unorthodox but legal behavior. Further, they deny equal protection of the laws by subjecting complainants to arrest and prosecution for being idle, while those idle persons who are in affluent financial circumstances are not harassed, arrested or prosecuted.

Complainants claim § 42–22 is uncertain and equivocal on its face and was invalidly applied to complainants Brock, Creech, de Garcia, Harity, Johnston, Lundy and Pazon; that such an application of the law violates plaintiffs' rights to freedom of speech, association and peaceable assembly and are cruel and unusual punishment in that they penalize plaintiffs' lawful but unorthodox mode of dress and behavior. The Ordinance allegedly also denies equal protection of the laws, by substituting a policeman's idea of conformity for that legal certainty required by law.

Complainants have averred by petition and reurged in argument that the New Orleans police have threatened and continue to threaten to enforce these illegal ordinances against complainants; that the arrest and threats of further arrests are for the purpose of harassing and intimidating complainants in the exercise of their constitutional rights. Complainants conclude by alleging irreparable injury and that they have no adequate remedy at law.

On October 2, 1966, New Orleans police officers Tobin and Dupre received a radio complaint to the effect that a group of individuals in Jackson Square were being loud and boisterous and were additionally interfering with the performance of a children's band or orchestra called the "Honky Tonks." This band had been playing regularly in the Square for some time under the auspices of, and for the benefit of the New Orleans Crippled Children's Hospital. Upon their arrival the officers noted that Johnston's and Weinert's group were drinking wine, eating French bread, a few possessed musical instruments and they were not only being loud and boisterous, but were interfering with the free enjoyment of the park by others, particularly the "Honky Tonks." They were obstructing sidewalks and were by loud noises deliberately interfering with the peaceful enjoyment of the park by many other individuals and groups. The complainants were asked by the officers to either behave or leave the park, as a result of which many of the group did depart. Weinert and others remained on the scene and continued the objectionable behavior. Johnston left the scene but later returned. Officers Tobin and Dupre then called Lieutenant Sempe, who also observed the conduct of complainants. After a short while, Johnston, Weinert and two others, not parties to the suit, were arrested. The affidavit [5] charged violations of Municipal Ordinance § 42–85, par. 5, which was described in the affidavit as "vagrancy by having no visible means of support," and § 42–90 which was described in the same affidavit as "refusing to move on."

Complainants admitted to drinking wine, singing, playing guitars and eating French bread, but denied that they were being loud and boisterous or otherwise disturbing other visitors in the park. Petitioners claimed (through counsel) that they were arrested not because they were misbehaving, but because of their unorthodox dress and behavior. This Court noted at the trial that several of the plaintiffs and their friends did have extremely unorthodox dress and the men wore their hair long. Coupled with their admitted unorthodox behavior, which included lying around on the ground in a small but crowded public park on a Sun-

---

5. Plaintiffs' Exhibit B. These were the only affidavits introduced in evidence.

The Court asked that all be produced but neither party complied.

day afternoon playing guitars, drinking wine and eating French bread, it was no wonder that they attracted attention of fellow visitors in the park and of the police. Considering all the testimony, this Court has no difficulty concluding that in both the incidents in Jackson Square that the plaintiffs were loud and boisterous, subject to censure and discipline, and would have been subject to criticism even if they had been orthodox in dress. The Court specifically finds the police version of what took place at the park in both instances more credible than that of complainants.

On October 30, 1966, police officers, Tobin and Dupre, were told by an elderly man that a group of people were in Jackson Square eating, drinking, blocking sidewalks, and creating a general disturbance. Upon arrival at the Square, the police observed a large group of individuals of unorthodox dress lying around on the grass, drinking wine, eating bread and littering the grounds with wine bottles and paper. One individual was making himself particularly obnoxious by flipping a handkerchief or scarf in the face of passing pedestrians. The offenders were asked to leave. Many left the park but several stayed and continued their activities. After receiving several more complaints from other visitors in the park, plus a complaint from the Custodian of the park, and after observing the behavior of the offending groups for 20 or 30 minutes, the second group of complainants were arrested. Just prior to their arrival on the scene, the police had received complaints of plaintiffs' conduct which they did not observe. However, most of the conduct which formed the basis of the arrest was observed by the officers. The affidavits charged violations of City Ordinances §§ 42–22, 28–18, 42–90. These charges were still pending in the New Orleans Municipal Court at the time the instant suit was filed. The Court believed the police version of the second incident and was not impressed with the testimony of the plaintiffs.

Complainant Lacey's case is somewhat different from the others. Lacey's hair and dress at the time of trial could not have been described as unorthodox. No proof was adduced that Lacey and the other plaintiffs were even known to one another prior to these arrests. Lacey was arrested on November 7, 1966, while passing out leaflets [6] in a New Orleans housing project at 9:00 o'clock in the evening. Lacey was apparently going door to door and placing the leaflets under the doors of the various apartments. Several tenants complained of his being there and the police were called. The officers insisted that he was not arrested because of the contents of the leaflet, but because he was a vagrant with no lawful means of support. The police officer who made the arrest had obviously misread or misunderstood the Ordinance's proscription and how it should be applied, because this Court after hearing the officer's testimony would be constrained to hold that the arrest was illegal. This is not to say that the Ordinance under which he was arrested is void on its face, because a ruling on the constitutionality of the Ordinance is not necessary in deciding this case. Suffice it to say, the police officer's questions put to Lacey at the time of his arrest and Lacey's answers, did not indicate that Lacey was in violation of this or any other Ordinance known to the Court. New Orleans Police Chief, Joseph Giarrusso, testified at the trial and agreed that the officer's arrest of Lacey was illegal but assured the Court that not only the arresting officer but the entire police force would be instructed further concerning the language of the Ordinance and the type of arrest which would be permissible under the Ordinance's language. In any event, the charges against Lacey were dropped prior to the instant suit being filed and no evidence was produced to prove that Lacey would be arrested again if he resumed distribution of his leaflets. Additionally, the Court finds that plaintiffs failed to prove that defendants were en-

6. Plaintiffs' Exhibit A.

gaged in a conspiracy among themselves and other persons to arrest, harass or intimidate complainants because of their unorthodox dress or behavior or because of the contents of any leaflets they were seeking to distribute.

At the outset this Court would be the first to agree that the plaintiffs had a right to frequent the Jackson Square Public Park and to eat French bread, drink wine, lie on the ground and otherwise enjoy themselves, provided they did not infringe upon the rights of others to equal enjoyment of the Park's facilities. It is equally true that plaintiff Lacey was exercising his First Amendment rights the night he distributed the controversial literature in the public housing project. The time of the night and the method by which he sought to exercise those rights, however, did not reflect good judgment. Most people at that time of night in a community of the size of New Orleans undoubtedly view with great fear and trepidation individuals who, in the quiet of the late evening, go from door to door to distribute leaflets or for any other purpose. Lacey's neglect to properly present and identify himself merely intensified the uneasiness of the inhabitants over his presence. Additionally, the Police Department acted reasonably when they responded to the call of the people in the neighborhood and intercepted Lacey while he was distributing the leaflets. But when Lacey offered proof that he was not only employed but had been employed on the day of the incident and was arrested nevertheless, the Police used poor judgment and Lacey's arrest for the offense charged was obviously illegal. The Court sees no need to rule on the constitutionality of either the Ordinances under which the Jackson Square arrestees were charged, or on the Ordinance under which Lacey was charged, as the Court is convinced that equitable relief should not be granted in these cases and that a declaratory judgment need not be made.

I concede that the law and jurisprudence does not light the way as clearly as I would like, but there is adequate authority to support the view that plaintiffs are not entitled to the relief prayed for.

■ Obvious conflicts arise when Federal equity is exercised in State court matters. This is not a new problem because the British long ago developed the doctrine of comity which required that no court interpose its process after another court had acquired jurisdiction of a cause. Disputes over alleged Federal court interference in State court cases induced Congress to convert this old comity doctrine to a positive rule of law.[7]

It is clear then that if the Jackson Square complainants are to get relief they must first show that § 2283 is inapplicable, or that the facts of this case constitute one of the many exceptions which have been established by the law and the jurisprudence.[8]

■ As we have said as to those plaintiffs who were arrested in Jackson Square, proceedings in a State court were pending. Clearly then, unless plaintiffs proceed under an Act expressly authorized by Congress, or this Court is required to intercede in aid of its jurisdiction or to protect or effectuate its judgments, then this Court may not intervene. Contemplating this difficulty, plaintiffs claim that in respect to the charges still pending that they invoke the jurisdiction of the Court under Title

**7.** 28 U.S.C. § 2283. "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

The statute is applicable to both Civil and Criminal cases.

**8.** Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951); City of Miami v. Sutton, 5 Cir., 181 F.2d 644.

42 U.S.C.A. § 1983 and the related provision of the Judicial Code (Title 28 U.S.C.A. § 1343).[9] The latter confers original jurisdiction upon the district courts of actions to redress State deprivation of constitutional rights. Since the instant cases do not present litigation in which this Court must intervene in aid of its jurisdiction, or to protect or effectuate its judgment, then as to the arrests made in Jackson Square the Court must determine whether or not the Civil Rights Act (42 U.S.C.A. § 1983) constitutes an express authorization of a stay of State court proceedings within the meaning of the first exception of § 2283.

■ The history of § 2283 begins by an Act of Congress of March 2, 1793 and grew out of an early dispute between State and Federal authority over Federal court intervention in State matters. The statute was amended to provide for exceptions and remained in the latter form until June 25, 1948 when it was revised to read as it does presently. A number of exceptions to § 2283 have developed by judicial decision and by statute since it was originally adopted. Congress has established several exceptions to § 2283 most of which are not necessarily relevant in reaching a decision in this case.[10] We are left then with the

9. 42 U.S.C.A. § 1983. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

28 U.S.C.A. § 1343. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

10. Toucey v. New York Life Ins. Co., 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100.

Acts of Congress which have been uniformly recognized as creating exceptions are the Interpleader Act (28 U.S.C.A. 1335, 1397, 2361) which contains an express grant of power to enjoin State court actions, and the Removal Act (28 U.S.C.A. § 1443). The Interpleader Act gives specific power to enjoin state proceedings and while the Removal Statute does not specifically authorize injunctive relief, it is unquestionably inherent in the power to remove. The Civil Rights Act, on the other hand, only gives a general right to equitable relief. As broad as it is, the Removal Statute has been narrowly construed by the Supreme Court in Civil Rights cases. State of Georgia v. Rachel, 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966); City of Greenwood, Miss. v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966); Dilworth v. Riner, 343 F.2d 226 (5 Cir.1965). The late Supreme Court cases re-emphasize the Courts' reluctance to interfere except in extraordinary circumstances. In the Rachel case, the Court indicated that it would approve removal only if defendants rights under the Civil Rights Act of 1964 were threatened or denied. That Act specifically authorizes Federal Court intervention. In Peacock, the Court denied removal saying that only in the "rare situation where it can be clearly predicted by reason of the operation of a pervasive and explicit law that federal rights will inevitably be denied by the very act of bringing the defendant to trial in the State court" will removal be permitted. In Dilworth, the Fifth Circuit approved removal and enjoined State action on the strength of the Civil Rights Act of 1964. Judge Brown said § 2283 was no deterrent since the Civil Rights Act of 1964 provided specifically for legislative relief and was therefore an express authorization of Congress.

question of whether or not the Civil Rights Statute is express authorization by Congress to Federal courts to act in cases of the type that are now before us. The Supreme Court of the United States has never answered this question and, as a matter of fact, specifically refused to answer it in the *Stefanelli* and *Dombrowski* [11] cases. However, the doctrine of abstention, or comity, is so deeply embedded in the Court's thinking that the implication was clear that the Civil Rights Act would not warrant intervention except in the most extreme set of circumstances.[12] The Fourth Circuit Court of Appeals, in Baines v. City of Danville,[13] has said that the Civil Rights Act creates a Federal cause of action "with no suggestion, explicit or implicit, that appropriate relief shall include an injunction which another Act of Congress forbids." The Court pointed out that other specific statutory exceptions, such as the Removal Act, either explicitly or implicitly suggest ancillary injunctive relief is available. The Court went on to say that when the United States is not involved as a party in these suits and there is grave danger of further irritation between Federal and State courts, the United States Supreme Court has been disposed toward a very strict construction of § 2283.[14] In Amalgamated Clothing Workers of America v. Richman Bros. Co., the Court stated categorically that the prohibitions in § 2283

should not be "whittled away by judicial improvisation." The Court in the *Baines* case concluded that it, as an inferior court, ought not to take lightly the Supreme Court's admonition, noting that the Supreme Court has almost invariably required or sanctioned Federal forebearance in Civil Rights cases particularly where action has begun in the State courts.[15] The evidence presented at the trial of this case does not, in the Court's mind, create a threat of irreparable injury clear and eminent which was thought necessary by Justice Frankfurter in the *Stefanelli* case and by Chief Justice Stone in the *City of Jeannette* case.[16] As the Court said in the Baines case, "In our view, the Congressional command [Section 2283] ought to be ignored only in the face of a most compelling reason, but we have certainly been told by the Supreme Court in those circumstances it may be disregarded, for its parentage discloses that it was not intended to be as absolute as it sounds." The Civil Rights Act therefore affords plaintiffs no relief.

In spite of all the foregoing, plaintiffs have urged the Court to consider that Dombrowski v. Pfister [17] has, to a degree at least, overruled *City of Jeannette* and *Stefanelli*. *Dombrowski* is easily distinguishable, particularly in respect to the Jackson Square complainants. Both the majority and the dissenters in *Dombrowski* noted the existence

---

11. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

12. Justice Frankfurter in the *Stefanelli* case said that "For even if the power to grant the relief here sought may fairly and constitutionally be derived from the generality of language of the Civil Rights Act, to sustain the claim would disregard the power of courts of equity to exercise discretion when, in a matter of equity jurisdiction, the balance is against the wisdom of using their power."

13. 337 F.2d 579 (4 Cir.1964).

14. Toucey v. New York Life Ins. Co., supra; Amalgamated Clothing Workers of America v. Richman Bros. Co., 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600.

15. Douglas v. City of Jeannette, supra; Stefanelli v. Minard, supra; Browder v.

Gayle, 5 Cir., 142 F.Supp. 707, Aff'd without opinion by the Supreme Court; Morrison v. Davis, 5 Cir., 252 F.2d 102. No State proceedings were pending in the *Browder* and *Morrison* cases.

16. In the *City of Jeannette*, Chief Justice Stone said "[C]ourts of equity in the exercise of their discretionary powers should conform to this policy [comity] by refusing to interfere with or embarrass threatened proceedings in the state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and eminent * * *" Justice Frankfurter in *Stefanelli* denied equitable relief saying "[n]o such irreparable injury, clear and eminent, is threatened".

17. Note 11, supra.

of § 2283. In *Dombrowski,* the Ex parte Young [18] was cited as the fountainhead of Federal injunctions against the State prosecutions, but the Court noted that since the *Young* decision "considerations of federalism have tempered the exercise of equitable power, for the Court has recognized that Federal interference with a State's good faith administration of its criminal laws is peculiarly inconsistent with our Federal framework", citing the *City of Jeannette* case. The Court went on to point out in its note, that § 2283 did not preclude injunctions against the institution of State court proceedings, but only barred the stays of suits already instituted. This, of course, is the basic difference between *Dombrowski* and the cases of the complainants of Jackson Square. Justice Harlan, with whom Justice Clark joined, noted in his dissent in *Dombrowski* that "If the state criminal prosecution were instituted first, a federal court could not enjoin the state action." Note 2 in the majority opinion clearly inferred that had the indictment of the plaintiffs in the *Dombrowski* suit occurred prior to the date the suit was filed, § 2283 would have proscribed Federal action.

■ Additionally, the *Dombrowski* facts were not the same as in the instant case. In *Dombrowski,* the Court found that a substantial loss or impairment of freedom of expression would have occurred if the plaintiffs were required to wait for the State court's disposition and ultimate review in the Supreme Court of an adverse determination. This, the Supreme Court said, constituted irreparable injury. Even more significant was the fact that the plaintiffs in the *Dombrowski* case had proved at the trial that the activities of the State had produced a "chilling effect" on free expression by the plaintiffs by prosecutions initiated and threatened. Plaintiffs in the *Dombrowski* case proved on the trial that

their activities were legitimate exercises of their constitutional rights and no illegal acts other than the promotion of Civil Rights for Negroes was engaged in by the plaintiffs. In this Court's view, the Dombrowski case merely holds that § 2283 does not prevent Federal relief where no State court action was pending and where the statutes are justifiably attacked on their face as being illegal or unconstitutional; or where these statutes are persistently applied for the purposes of discouraging protected activities. Therefore, the Court is constrained to dismiss the suits of the Jackson Square complainants.

■ In the Lacey case, as we have said, we have a different factual situation. There was no case pending against Lacey in State court. In applying the teachings of *Dombrowski, Stefanelli* and *City of Jeannette* to Lacey, the Court is constrained to likewise dismiss his suit. No proof was made at the trial of any threats of a continuous prosecution against Lacey. There was no proof that Lacey would be required to wait for a State court's disposition of a case, in which he may be charged in the future, and thereby cause him a substantial loss or impairment of freedom of expression.[19] There was no proof outlining a "chilling effect" on free expression of prosecutions initiated or threatened. There was no statutorily defined activity enjoying specific protection [20] which Lacey was threatened with losing.[21] Had Lacey been repeatedly arrested or threatened with arrest each time following his dissemination of his position concerning the United States' involvement in Viet Nam, the Court could then look to the constitutionality of the Ordinance, under which he was arrested on its face, and could seriously consider granting Lacey injunctive relief. Absent such showing, Lacey's case must also be dismissed.

18. 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714.

19. City of Greenwood, Miss. v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944.

20. State of Georgia v. Rachel, supra; Dilworth v. Riner, supra.

21. *Dombrowski,* supra; *Stefanelli,* supra; *City of Jeannette,* supra.