ACKERMAN, Atty. Gen. v. INTERNATION-
AL LONGSHOREMEN'S & WARE-
HOUSEMEN'S UNION et al.

BEVINS, County Atty. et al. v. INTERNA-
TIONAL LONGSHOREMEN'S & WARE-
HOUSEMEN'S UNION et al. (two cases).

ACKERMAN, Atty. Gen. et al. v. INTERNA-
TIONAL LONGSHOREMEN'S & WARE-
HOUSEMEN'S UNION et al.

Nos. 12300, 12301.

United States Court of Appeals,
Ninth Circuit.

Feb. 28, 1951.

Rehearing Denied May 25, 1951.

Walter D. Ackerman, Jr., Atty. Gen. Territory of Hawaii, J. Garner Anthony, Special Deputy Atty. Gen., Rhoda V. Lewis, Asst. Atty. Gen., Richard K. Sharpless, Deputy Atty. Honolulu, T. H., for appellants.

Bouslog & Symonds and Harriet Bouslog, all of Honolulu, T. H., for appellees.

Thomas M. Waddoups, Samuel P. King, Edward N. Sylva, H. R. Hewitt, W. B. Stephenson and J. Donovan Flint, all of Honolulu, T. H., for Bar Association of Hawaii, as amicus curiae.

Before DENMAN, Chief Judge, ORR and POPE, Circuit Judges.

POPE, Circuit Judge.

These are appeals from judgments in two actions brought by the International Longshoremen's & Warehousemen's Union (ILWU), a labor union, and by certain individual members of that union, to enjoin the prosecution of four criminal proceedings pending in the circuit court of the Territory of Hawaii, one for riot and conspiracy, and three for riot. The court below entered final decrees granting permanent injunctions as prayed, against the Attorney General of the Territory, the County Attorney and Deputy County Attorney of the County of Maui, and in one case the County Chief of Police.

The criminal charges grew out of certain disorders which occurred during separate strikes by sugarworkers, and pineapple workers, members of the ILWU union. On the morning of October 16, 1946, during the sugarworkers strike, some three to four hundred members of that group were in a picket line, four columns deep, before the entrance to the sugar mill of Maui Agricultural Company at Paia, on the Island of Maui. Five workmen employed in the mill appeared for the purpose of crossing the picket line and going to work. The same men had attempted to pass through to work the previous day, but had been prevented because the pickets stood shoulder to shoulder. On the 16th a number of police were on hand.[1] As the mill whistle blew the five men, escorted by the police, started toward the mill entrance. Two hundred of the pickets converged on the five men and pushed them back. Upon a second attempt to pass the five workmen and the police were pushed back 10 or 12 feet farther. This ended the attempts to enter the mill. There is no finding that any blows were struck.

In consequence of this incident some 75 men have been indicted, charged with riot and conspiracy under the Territorial unlawful assembly and riot act, Chap. 277 Rev.Law of Hawaii, 1945, §§ 11570–11584, and the Territorial conspiracy statute, Rev.Laws of Hawaii, 1945, § 11120.[2]

The other three criminal proceedings grew out of incidents later occurring in connection with the pineapple workers strike, on the Island of Lanai, also in the County of Maui. On July 14, 1947, as several supervisory employees of the Hawaiian Pineapple Company, not members of the union, were about to load upon a barge some pineapples picked before the strike and then in bins upon the wharf, about 300 union pickets led by union "picket policemen" ran toward the men on the wharf, yelling "at the tops of their voices", caught and beat one of the men, chased and "punched at" another, forcing him and another man to jump into the water to escape, broke open the bins and threw pineapples at the barge and tug and at the men in the water.

Two complaints, charging riot, were filed against persons accused of participating in this incident. In one case eleven defendants, and in the other, 36 defendants, were committed after waiving preliminary examination, to await the action of the grand jury.

On the day following the incident at the wharf, 20 to 25 persons headed by "union police" with arm bands, went to the rooms of two non-striking truck drivers employed by the Hawaiian Pineapple Company on the Island of Lanai, and administered "a severe beating" to both of them. A complaint, charging riot, was filed against five persons charged with par-

---

1. The opinion of the district court states that at this time "After certain preliminary conversations between members of the ILWU, Kealoha, Joseph Kaholokula, and others, respecting the entry of the five workmen to the mill it was stated by Kaholokula that if the five men tried to cross the picket line, 'police or no police', there would be violence and bloodshed." 82 F.Supp. 65, 79.

2. The pending indictment is the second one in the same case. A plea to the first indictment, challenging its sufficiency, was denied by the circuit court and an interlocutory appeal allowed to the Supreme Court of Hawaii, which construed the criminal statute, and held it constitutional, but found the indictment fatally defective in form. Territory of Hawaii v. Kaholokula, 37 Haw. 625. The second indictment followed.

ticipating in this affair. They also were committed awaiting action by the grand jury. The prosecution of these defendants and of the other defendants similarly bound over, has proceeded no further by reason of the injunctions issued by the court below.

The individual plaintiffs in these actions are the defendants in the four criminal proceedings mentioned, plus two officials of the union who purport to sue on behalf of themselves and all other members of the union in the Territory.

Judgment in No. 12301 was based upon a complaint seeking to enjoin further prosecution of the proceeding in which the indictment was returned. The complaint in No. 12300 sought similar relief in respect to the three proceedings in which commitments had been made. Both complaints allege that in furtherance of the objectives of the strikes, which were to obtain better wages, hours, and conditions of employment, the individual plaintiffs engaged in "lawful, peaceful and constitutionally protected activities of speech, press and assemblage and of peaceful picketing." The unlawful assembly and riot statute and the conspiracy statute are attacked as unconstitutional in that they are alleged to deprive plaintiffs of their rights of free speech, press and assemblage and will subject them to criminal prosecutions if they exercise their constitutional rights. It is alleged that the grand jury which found the indictment was chosen and composed in an unconstitutional manner. Prayer was for injunction prohibiting the enforcement of the criminal statutes mentioned, that prosecution of the criminal proceedings be enjoined, and that the statutes be held unconstitutional.

The trial court[3] recognized that the prayer for an injunction restraining the prosecution of criminal proceedings posed

serious difficulties, and in this connection quoted from the opinion of Chief Justice Stone in Douglas v. City of Jeannette, 319 U.S. 157, 163, 63 S.Ct. 877, 881, 87 L.Ed. 1324, as follows: "It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction. * * * Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury 'both great and immediate.'"

But the trial court held that the facts of this case were such as to take it outside of the ordinary rule that courts of equity will not enjoin criminal prosecutions; that it involved exceptional circumstances which permit injunctive relief, and that there has been a disclosure of the "irreparable injury 'both great and immediate'", mentioned in Douglas v. City of Jeannette, supra.

The court found two such special circumstances. First, it said, "All collective bargaining in the Territory of Hawaii in our opinion is substantially affected by the two statutes[4] as well as by the prosecutions

---

3. The case was heard before the decision in Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 69 S.Ct. 606, 93 L.Ed. 741, by three judges who, although of the opinion they were properly constituted as a court of three judges under Title 28, U.S. C.A. § 2281, held that if that section had no application, they were in any event a district court "sitting in bank". Since

the decision and all rulings were unanimous, the circumstance of three judges participating we consider of no significance here. The extended opinion of the court is reported in 82 F.Supp. 65.

4. [i. e., the unlawful assembly and riot act and the conspiracy statute, both of which the court held unconstitutional.]

conducted or about to be carried on thereunder. Approximately thirty thousand members of the ILWU and the union itself necessarily feel the impact of the statutes as does each employer in the sugar and pineapple industries. All labor relations in the Islands are clouded by them. On the records presently before us we think it is fair to state that equable or amicable relations between employers and employees in the Territory of Hawaii are impossible while the statutes stand. The repercussions which arise from the enforcement of these statutes of the Territory are such as to cause great and irreparable harm and damage to all labor relations in Hawaii."

This portion of the opinion of the court was bottomed upon the case of A. F. L. v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873. The trial court's opinion quoted from that case what was there said of the requirement of proof of "irreparable injury which is clear and imminent" as follows: "That is a strict test. But we think appellants satisfy it. We reach that conclusion on the basis of the allegations concerning the disruption of the collective bargaining processes and the injury to the unions and to the employers alike, if the closed-shop agreement is outlawed. As we have said, it is averred that there are about 500 contracts with Florida employers containing closed-shop agreements * *". 82 F.Supp. 65, 109.

We are unable to perceive any resemblance between the facts here and those in A. F. L. v. Watson, supra. There it appeared that the plaintiff labor unions were engaged in negotiating closed shop agreements, as they asserted they had the right to do by virtue of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. and that the proceedings which the Attorney General of Florida proposed to institute against them, pursuant to the newly adopted Florida constitutional amendment, was an imminent threat to an entire system of collective bargaining, involving 500 contracts, and many thousands of employees.

Here there is no showing of any attempted collective bargaining, or other legitimate union activity with which any act here charged to the defendants could possibly interfere. The evidence shows, on the contrary, that the activities in which the plaintiffs were engaged at the time of the occurrence out of which the criminal prosecutions arose had nothing to do with any right granted by the Labor Management Relations Act, 1947,[5] the Civil Rights Act,[6] or Amendments I, V, VI, XIV and XIX to the Constitution, upon which plaintiffs' rights are alleged to be founded. The activities and conduct of the plaintiffs here, (characterized by the trial court as the "illegal conduct of the strikers") involved the sort of conduct "policing of [which] is left wholly to the States. * * No one questions the State's power to police coercion by those methods." International Union, U. A. W. v. Wisconsin Employment Relations Board, 336 U.S. 245, 253, 69 S.Ct. 516, 93 L.Ed. 651.

Perhaps implicit in the trial court's finding that labor relations and collective bargaining were adversely affected, is the court's apparent view that the very existence of an unconstitutional act upon the statute books operated as a psychological obstacle to labor activities and negotiations. Such an argument, if sound, would lead to the result that an injunction might issue in any case where an unconstitutional statute might constitute a mental hazard. Thus the statute attacked in Douglas v. City of Jeannette, supra, was unquestionably unconstitutional, for the court so held in Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, yet the bill in the Jeannette case was held to be without equity. No doubt the invalid ordinance there was as much of a psychological hazard to the Jehovah's Witnesses, as the statutes here attacked could be to union labor.

The other exceptional circumstance which the court held justified enjoining the criminal proceedings, was found in the determination that the prosecution of these

---

5. 29 U.S.C.A. § 141 et seq.

6. 8 U.S.C.A. §§ 41, 43, 44, 46, 47, 49(a); 28 U.S.C.A. § 1343.

proceedings was not in good faith. The trial court did not undertake to cite any case in which proof of bad faith in a criminal prosecution was held to establish reason for departure from the ordinary rule that a court of equity will not entertain a suit to enjoin criminal prosecutions. The court evolved its conclusion that want of good faith was a sufficient reason for issuing such an injunction from the phraseology used in Douglas v. City of Jeannette, supra, that "courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from *prosecution in good faith* for his alleged criminal acts." (Emphasis added.) The court reasoned that in inserting the words "in good faith" in the quoted language, the court was at least implying that only prosecutions *in good faith* are immune from equity injunctions, and hence if bad faith be shown the criminal prosecution may be enjoined. We think this purely textual analysis of the quoted language is not warranted, for to say that one is not immune from prosecution in good faith does not imply that one is immune from prosecution in bad faith, and may enforce that immunity by injunction. The trial court recognized that "the motive of the prosecutor is of course not relevant to the ordinary criminal proceeding."

We cannot bring ourselves to believe that a defendant in a criminal case, who would not be permitted to plead or prove as a defense to the charge, that the prosecutor's motives were bad, could nevertheless by alleging such bad faith and the invalidity of the criminal statute, move into a court of equity and have those issues tried there. No case has been called to our attention which has applied the trial court's theory that proof of bad faith in the criminal prosecution is sufficient to warrant enjoining the criminal proceedings.[7]

The trial court has failed to note what appears to us to be the probable reason for the use of the words "prosecution in good faith" in the sentence quoted from the Jeannette case. Appellants have called our attention to the fact that the statement: "No citizen * * * is immune from prosecution, in good faith, for his alleged criminal acts", was first used in decisions following Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423. Such decisions, thus referring to "prosecution in good faith", are Beal v. Missouri-Pacific R. Corp., 312 U.S. 45, 49, 61 S.Ct. 418, 85 L.Ed. 577; Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 4416, and Douglas v. City of Jeannette, supra.

We think a more likely explanation of the use of this phrase is that the Supreme Court had in mind such cases as Hague v. C. I. O., supra, in which it appeared that plaintiffs seeking to hold peaceful meetings and to distribute literature were threatened with arrest under the void Jersey City ordinance, and their associates had been arrested and carried out of the city, all in line with a deliberate policy of excluding and removing plaintiffs' agents from Jersey City. Indeed, the Jeannette case, supra, 319 U.S. at page 164, 63 S.Ct. at page 881, made specific reference to this aspect of the Hague case in distinguishing it. Another type of case is that represented by Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, where the applicant for injunction was confronted with threatened prosecution under a statute imposing such large penalties he dare not test its validity by violation inviting prosecution. Because of the special facts which were present in Hague v. C. I. O. and Ex parte Young, the applicants for injunction had

---

7. On the contrary, compare Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L. Ed. 633. A claim of denial of constitutional rights and of official bad faith, oppression and misconduct in the prosecution of petitioner in a state court was made in a petition for removal. Petitioner was remanded to the custody of the State authorities. Even where the bad faith charged against the prosecutor involved the knowing use of perjured testimony, and a deliberate suppression of evidence, and hence was itself a denial of due process, the petitioner for federal court action (habeas corpus), was required first to exhaust his remedy in the state courts. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791. Accord, Ex parte Hawk, 321 U.S. 114, 116, 64 S.Ct. 448, 88 L.Ed. 572.

no reasonable opportunity to test their rights in the criminal cases. For this reason the threatened prosecutions there were not in good faith. In those cases it could not be said, as it was in Douglas v. City of Jeannette, that "the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction." Such, we think, is the case here.

 Furthermore, we think want of good faith was not proven, and the court's finding in that respect clearly erroneous. The principal ground of bad faith is said to be that "no one has been prosecuted under the unlawful assembly and riot act except in connection with labor disputes". But unless riots did occur at places and under circumstances not involving labor disputes which called for complaints which the prosecutor refused or neglected to file, the quoted statement has no significance. It is not claimed, and there was no allegation or proof that there were any such unprosecuted violations. The remainder of the circumstances listed by the court's opinion as evidence of bad faith, it seems to us, are no more than expressions of the trial court's opinion that the prosecution

was too vigorous, or that the police officers rather than the prosecuting attorney, should have selected the statute under which complaint would be filed, or that the methods used in securing evidence were poor.[8] In our opinion these circumstances are insufficient to establish want of good faith. We must therefore disagree with the conclusion of the trial court that the facts here present extraordinary circumstances to take this case out of the ordinary rule that a court of equity will not enjoin a criminal prosecution.

But there is a further reason why, in our opinion, these cases cannot, in any event, warrant the granting of injunctions. In Babcock v. Noh, 9 Cir., 99 F.2d 738, 739, this court said: "In support of the decree appellee argues broadly that a court of equity may enjoin a criminal prosecution under a void statute where such prosecution amounts to a wrongful invasion of a property right, [citing cases]. However, the present suit is not within the principle announced in these authorities. What was sought in those cases was relief against threatened, not pending, prosecutions; and in them the court proceeded upon the view that one is not compelled to test the constitutionality of an act by first incurring

8. The trial court's enumeration of the facts thought to show bad faith was as follows: "In this connection the following facts among others in the instant cases are pertinent: (1) (a), the mass arrests, and the very broad, indeed, the too broad field, from which the police drew the defendants in the various criminal proceedings after both the Paia and the Kaumalapau Harbor incidents, demonstrated by the fact that the names of sixteen persons were stricken out of one of the complaints and that of ninety-three arrests made on the Island of Oahu on July 13, 1947 only one person, viz. Sibolboro, was subjected to prosecution, all other complaints being nolle prossed; (b) the naming of persons as defendants in criminal proceedings from photographs taken by the police both prior and subsequent to the occurrence of the Kaumalapau Harbor incident; * * * (d) the excessive bail required of many of the plaintiffs in the instant cases; (2) the fact that Assistant Chief of Police Freitas did not read the unlawful assembly and riot act to the strikers during the Paia or Kaumalapau incidents and did not contemplate the swearing out of a complaint against any of the plaintiffs under that statute until directed to do so by the prosecuting officers of Maui County; (3) the repeated selection of the unlawful assembly and riot act with its heavy penalties as the vehicle for the prosecution of comparatively minor infractions of the criminal laws; (4) the haste with which the prosecuting officers of Maui County procured the second indictment of Kaholokula and others when the first indictment was held invalid by the Supreme Court of Hawaii; (5) the fact, for we have found it to be a fact, that no one has been prosecuted under the unlawful assembly and riot act except in connection with labor disputes at any time during the life of the Territory; and (6) the fact that the maximum penalty under the unlawful assembly and riot act was increased from five years' imprisonment to twenty years' imprisonment in 1929, following the Filipino workers' strike in 1924."

drastic penalties attached to its violation, but may, under extraordinary circumstances, appeal to equity for relief against the invasion of his property rights through the threatened enforcement of the statute. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927; Terrace v. Thompson [263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255]. Here, no threat of the institution of other criminal proceedings under the act is alleged in the bill or found to have been made. The relief sought is against the further prosecution of the pending case."

■ The injunctions here issued related solely to prosecutions *then pending*.[9] There is no injunction against any *threatened* prosecutions. The complaints contained no allegations to support an injunction against future or threatened criminal proceedings. The only allegation of future damage was that the criminal statutes "will deprive plaintiffs of their liberty and property without due process of law, in that plaintiffs will be prohibited from exercising their rights of free speech, press and assemblage in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States," and that the union could not function "so long as the members of the said ILWU are subject * * * to prosecution under statutes containing unconstitutional limitations." This falls far short of an allegation that these plaintiffs were threatened with prosecution under the statutes on account of peaceful picketing, publicizing, bargaining, or exercising other constitutional rights and privileges. This defect in the complaints was called to the attention of the court and of the plaintiffs by motions which pointed out the failure to complain of threatened future action,[10] but the motions were de-

nied. The court made no finding that future prosecutions were threatened.

■ The rule stated in the Babcock case was that declared in Ex parte Young, 209 U.S. 123, 162, 28 S.Ct. 441, 455, 52 L.Ed. 714, as follows: "But the Federal court cannot, of course, interfere in a case where the proceedings were already pending in a state court." The same rule was followed and applied in Cline v. Frink Dairy Co., 274 U.S. 445, 452–453, 47 S.Ct. 681, 71 L. Ed. 1146.

■ The distinction stated in the Babcock case, between pending and threatened prosecutions, is founded upon certain fundamental characteristics of equity jurisdiction. The first to be noted is that stated in Douglas v. City of Jeannette, supra, 319 U.S. at page 165, 63 S.Ct. at page 882: "In any event, an injunction looks to the future." In the case before us all that is drawn in question are past acts. There is no proof or finding that for exercising lawful rights plaintiffs are threatened with future prosecutions under the statutes they assail. Thus, for the court below to assume to enjoin prosecution of the four pending proceedings is to assume to exercise a supervisory control over the action of the Territorial court. Such is not the function of a court of equity.

The second circumstance basic to this distinction was pointed out in the quoted portion of the Babcock opinion which states that where the prosecution is threatened, not pending, "one is not compelled to test the constitutionality of an act by first incurring drastic penalties attached to its violation, but may, under extraordinary circumstances, appeal to equity * * *" etc. Ex parte Young, which dealt with a statute having drastic penalties, is a classic example of such a situation. Here, on the contrary, in the four pending actions, the

9. The injunction in No. 12301 was "from proceeding with the prosecution commenced in October, 1946." That in No. 12300, was "from proceeding with the prosecution commenced August 1, 1947." Both dates were prior to the commencement of the suits.

10. Motions for more definite statement, to dismiss, and for summary judgments recited: "The complaint fails to show that said plaintiffs are threatened with more than one criminal proceeding, or that anything at all is involved other than prosecution of an alleged violation of the criminal laws of the Territory of Hawaii, with respect to matters which have already occurred."

plaintiffs have at hand full opportunity to test their rights by defending in those proceedings. As this court said in Alesna v. Rice, 9 Cir., 172 F.2d 176, 177, "Had the prosecution of the information proceeded, the jury might have acquitted the defendants, appellants, and the constitutional and other questions avoided. In any event, the appellants had a speedy and sufficient remedy at law by appeal to the Hawaiian Supreme Court, where the appellants' arguments of the two contentions may have prevailed. Losing, there is the appeal here. In both appellate courts the practice gives primacy of consideration to criminal appeals."

■ The rule that equity jurisdiction does not extend to enjoining pending criminal prosecutions, has no exceptions. No extraordinary circumstances will serve to create such jurisdiction.

■ That equity will stay its hand in respect to criminal proceedings, always when they are pending, and ordinarily when they are threatened, is a rule of wide and general application under our legal system. It is a rule of the state courts in respect to criminal proceedings in the same or other state courts. Milton Dairy Co. v. Great Northern Ry. Co., 124 Minn. 239, 144 N.W. 764, 49 L.R.A.,N.S., 951; State ex rel. Kenamore v. Wood, 155 Mo. 425, 56 S.W. 474, 48 L.R.A. 596. Federal courts apply the same rule when asked to enjoin criminal proceedings in the federal courts. Argonaut Mining Co. v. McPike, 9 Cir., 78 F.2d 584; Whitehead v. Cheves, 5 Cir., 67 F.2d 316, 317, certiorari denied 290 U.S. 704, 54 S.Ct. 371, 78 L.Ed. 605; Campbell v. Medalie, 2 Cir., 71 F.2d 671, certiorari denied 293 U.S. 592, 55 S.Ct. 108, 79 L.Ed. 686. It is a principle expressing a sound policy that the processes of the criminal law should be permitted to reach an orderly conclusion in the criminal courts where they belong.

■ But when the demand for an injunction is presented to a federal court, asking an injunction against proceedings in a state or territorial court, the reasons of policy against any such action are multiplied because of the necessity of avoiding whenever possible conflict between the two judicial systems. This policy was stated in Fenner v. Boykin, 271 U.S. 240, 243, 46 S.Ct. 492, 493, 70 L.Ed. 927: "Ordinarily, there should be no interference with such officers; primarily, they are charged with the duty of prosecuting offenders against the laws of the state, and must decide when and how this is to be done. The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection. The Judicial Code provides ample opportunity for ultimate review here in respect of federal questions. An intolerable condition would arise, if, whenever about to be charged with violating a state law, one were permitted freely to contest its validity by an original proceeding in some federal court."

■ That this policy applies to proposals to enjoin proceedings in the courts of Hawaii as well as to similar injunctions directed against state courts, we stated in Alesna v. Rice, supra: "The Jeannette case concerned the enjoining of state prosecutions. We think the criminal laws of the Territory of Hawaii are entitled to the same protection. Section 86(c) of the Hawaiian Organic Act, 48 U.S.C. § 642, 48 U.S.C.A. § 642, provides that the United States District Court for the District of Hawaii 'shall have the jurisdiction of district courts of the United States, * *.' * * * This court has recognized that the Organic Act places the courts of the Territory of Hawaii in a relatively similar position to the federal judicial system as are the state courts. See Wilder's S. S. Co. v. Hind, 9 Cir., 108 F. 113, 115, 116, affirmed 183 U.S. 545, 22 S.Ct. 225, 46 L. Ed. 321, and Yeung v. Territory of Hawaii, 9 Cir., 132 F.2d 374, 378." And since our decision in that case, the Supreme Court stated the reason for assimilating the position of the Hawaiian courts to that of State courts in Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 383, 69 S.Ct. 606, 614, 93 L.Ed. 741, as follows: "Entirely aside from the question of the propriety

of an injunction in any court, territorial like state courts are the natural sources for the interpretation and application of the acts of their legislatures and equally of the propriety of interference by injunction. We think that where equitable interference with state and territorial acts is sought in federal courts, judicial consideration of acts of importance primarily to the people of a state or territory should, as a matter of discretion, be left by the federal courts to the courts of the legislating authority unless exceptional circumstances command a different course."

Appellants argue that the district court was prohibited from granting the injunctions by § 2283 of Title 28, relating to injunctions "to stay proceedings in a State court". As we said in Alesna v. Rice, supra, we find it unnecessary to consider this question here.

The rules expressed in Babcock v. Noh, supra, and in Alesna v. Rice, supra, required the district court to deny the injunctions prayed for. The judgments are reversed with directions to dismiss the suits.