EAGLE BOOKS, INC., a Delaware
Corporation, et al., Plaintiffs

v.

Philip REINHARD, Individually and in his
capacity as State's Attorney of Winneba-
go County, Illinois, and Delbert Peterson,
Individually and in his capacity as Chief
of Police of the City of Rockford, Illinois,
Defendants.

No. 76 C 20014.

United States District Court,
N. D. Illinois, W. D.

May 28, 1976.

J. Steven Beckett, Champaign, Ill., for plaintiffs.

James Zagel, Asst. Atty. Gen., Chicago, Ill., A. Curtis Washburn, Rockford, Ill., for defendants.

Before CUMMINGS, Circuit Judge, and WILL and FLAUM, District Judges.

## MEMORANDUM OPINION

FLAUM, District Judge.

Plaintiffs are employees of bookstores and the corporate owner of those bookstores. They bring this suit to declare Ill. Rev.Stat. ch. 38, § 11–20 unconstitutional, and to enjoin defendant Philip Reinhard, State's Attorney of Winnebago County, Illinois and defendant Delbert Peterson, Chief of Police of the City of Rockford, Illinois, from enforcing the statute. Retrospective relief for prior activities carried out in connection with enforcement is also sought. Because of the injunctive nature of the relief requested against a state statute, a three judge court was requested under 28 U.S.C. § 2281. The substantiality of the federal question presented was discussed in a memorandum opinion issued by the single judge, issued April 15, 1976, which concluded with the convening of the present three judge court. In addition to the verified complaint, and the attached exhibits, representations of fact have been made through plaintiffs' Voluntary Bill of Particulars, motions and accompanying exhibits by both defendants for dismissal or summary judgment, and during oral argument held on May 14, 1976 before the three judge court. These sources are sufficient to dispose of this case. For the reasons which follow, prospective injunctive and declaratory relief will be granted with respect to the corporate defendant, and the suit will be dismissed with regard to the individual defendants without prejudice.

*FACTS*

Plaintiff Eagle Books, Inc. ("Eagle Books") owns two bookstores in the City of Rockford, "The Adult Book and Cinema", and the "Hollywood Art Store". Individual plaintiffs were employed as salespersons in these stores. In a series of searches at least in part authorized by search warrants signed by state judges, Rockford police appeared at the Eagle Book stores on February 27, March 1, and March 3, 1976. They seized the films named in the warrants, as well as the film projectors that carried them, monies, business records, a cash register, safe, brief case, and other items. Another search was made on March 11. The warrants were limited to films, and were based on complaints signed by police officers characterizing the conduct portrayed in the movies and giving the opinion of the officers that the movies were obscene. In the course of these searches, the individual plaintiffs were arrested under Ill.Rev.Stat. ch. 38, § 11–20 for the selling of "obscene" materials. On March 5, two more employees of the bookstores were arrested on the same ground. They were subsequently added as plaintiffs in this lawsuit. In the course of the searches, seizures and arrests, the bookstores cannot operate, and temporarily cease business. It is uncontested that the bookstores sell, in addition to items which were seized as obscene, communicative material which is not obscene. (*See* defendant Peterson's Motion To Dismiss Or In The Alternative For Summary Judgment, at 6; Transcript of Oral Argument at 37.)

Subsequent to the seizures of items from the bookstores, attempts were made by plaintiffs' attorneys to retrieve those items which were not specified in the warrant.

For reasons not entirely clear to this court, plaintiffs' attorney felt obligated to refuse return of at least some of the items unless the State's Attorney would stipulate that those items had been seized in violation of the law. Such a stipulation was never offered, and the items have all, consequently, been retained. (*See* Tr. of Oral Argument at 17–19.)

An important ingredient of plaintiffs' allegations is the prospect that the procedure for obtaining warrants to seize "obscene" movies is unconstitutional in that it gives rise to confiscation of communicative materials without adequate provision for a hearing or for supervision by a magistrate or other judicial officer. However, alternative search procedures have since been exclusively utilized by the defendants as part of an agreement which obviated the need for a ruling by this court on plaintiffs' motion for a temporary restraining order. Defendants have not, however, conceded that their original procedure is unconstitutional.

### JUSTICIABILITY

█ Law enforcement officers intended to prosecute violations of section 11–20. (*See* exhibit DD of "Exhibits For Defendant Reinhard's Motion To Dismiss Or For Summary Judgment"; Defendant Peterson's Motion To Dismiss, Or, In the Alternative For Summary Judgment at 6.) Taken together with the number and nature of searches carried out on Eagle Books' premises prior to the filing of the complaint, this circumstance leads the court to find that the prospect of future enforcement of section 11–20 in such a fashion as will disrupt the operations or deprive of materials the Adult Book and Cinema and the Hollywood Art Store is sufficiently immediate to give rise to a case or controversy under Article III of the Constitution. *Steffel v. Thompson,* 415 U.S. 452, 460, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

### CONSTITUTIONALITY OF SECTION 11–20

█ The plaintiffs' challenge to the constitutionality of section 11–20 revolves around the requirements set forth in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The circumstances under which *Miller* arose and the logical consequences of its holding and judgment merit examination to determine what it mandates state courts to do.

The *Miller* standards fall in two categories, a tripartite definition, and a requirement of specificity. The first category was described as follows:

> The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary standards' would find that the work, taken as a whole, appeals to the prurient interest . . . ; (b) whether the work depicts or describes, in a patently offensive way, *sexual conduct specifically defined by the applicable state law;* and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.

*Id.* at 24–25, 93 S.Ct. at 2615 (citations omitted, emphasis added). The second category is an elaboration of the specificity requirement alluded to in (b), above. *Miller* did not, however, set standards with its explanation of specificity; it merely gave examples of what would be sufficiently specific:

> We emphasize that it is not our function to propose regulatory schemes for the States. That must await their concrete legislative efforts. It is possible, however, to give a few plain examples of what a state statute could define for regulation under part (b) of the standard announced in this opinion, supra:
>
> (a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
>
> (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

*Id.* at 25, 93 S.Ct. at 2615. It can be seen from these examples that mere "sexual conduct" is not specific enough to give adequate notice of what is being regulated as obscene, but with the addition of "the ulti-

mate sexual act", it would be. Similarly, it can be seen that through the use of such examples, "excretory functions" can be incorporated into the "sexual conduct" of the (b) of the tripartite standard.

The tripartite standard of *Miller* was an embellishment on a tripartite standard then in use, originally promulgated in *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). The so-called *Roth-Memoirs* standard was that material could be regulated as obscene if:

. . . (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

*Memoirs v. Massachusetts, supra* at 418, 86 S.Ct. at 977, cited in *Miller v. California, supra* at 21, 93 S.Ct. at 2607. A comparison of the two tripartite standards must take into account the facts confronting the *Miller* Court. A defendant had been convicted for knowingly distributing obscene matter, under the California Penal Code, § 311.2(a). The jury had been "instructed that, in determining whether the 'dominant theme of the material as a whole . . . appeals to the prurient interest' and in determining whether the material 'goes beyond the customary limits of candor and affronts contemporary community standards of decency,' it was to apply 'contemporary community standards of the State of California' instead of the national community standards." 413 U.S. at 31, 93 S.Ct. at 2618. The court found these deviations from the prevailing view that a national standard should have been used did not give rise to a constitutional error. Thus, as far as the defendant was concerned, no complaint could be had as to the shift between the (a) and (b) of the respective standards, except for the specificity requirement alluded to in part (b) of the *Miller* tripartite standard. Conviction under part (c) of the *Memoirs* standard similarly could have no prejudice

to one arguing for part (c) of *Miller,* for material utterly without redeeming social value, as that term had been defined, would a fortiori lack serious artistic, literary, political, or scientific value. It thus appears from this comparison that the greatest difference in obscenity law, so far as the defendant in *Miller* was concerned, was the specificity requirement, a requirement never formalized in *Miller,* but only exemplified. This appears to be the sole, if not the most important explanation for the judgment of *Miller,* which was to remand the case back to the California state appellate court.

Further importance of the specificity requirement, in terms of the remand, appears from the nature of the material which the defendant was convicted of distributing:

While the brochures contain some descriptive printed material, primarily they consist of pictures and drawings very explicitly depicting men and women in groups of two or more engaging in a variety of sexual activities, with genitals often prominently displayed.

*Id.* at 18, 93 S.Ct. at 2611. This material is more than coincidentally covered by the suggested specifying examples of *Miller.* If the specificity requirement were surplusage, no remand should have been necessary at all.

Cases after *Miller* reasserted the importance of the specificity requirement, and even read in the *Miller* examples to constitutionally construe a federal statute. *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Similarly, the Court reserved for state court construction the specificity of statutes comparable to section 11–20 in *Miller* itself, and in the companion case of *Paris v. Adult Theatres I v. Slayton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). The relation of the specificity requirement to first amendment protections was underscored again in *Jenkins v. Georgia*, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974), in which Mr. Justice Rehnquist, speaking for a majority of the Court, held that the film Carnal Knowledge

could not, constitutionally, be treated as obscene:

> We . . . took pains in *Miller* to 'give a few plain examples of what a state could define for regulation under part (b) of the standard announced, 'that is, the requirement of patent offensiveness . . . While this did not purport to be an exhaustive catalogue of what juries might find patently offensive, *it was certainly intended to fix substantive constitutional limitations, deriving from the First Amendment, on the type of material subject to such a determination.* It would be wholly at odds with this aspect of *Miller* to uphold an obscenity conviction based upon a defendant's depiction of a woman with a bare midriff, even though a properly charged jury unanimously agreed on a verdict of guilty.

*Id.* at 160–61, 94 S.Ct. at 2755 (citations omitted, emphasis added).

In the context of the importance in *Miller* attached to specificity, the recent litigation concerning section 11–20 must be reviewed. Section 11–20, in pertinent part, reads:

> (b) Obscene Defined.
>
> A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. A thing is obscene even though the obscenity is latent, as in the case of undeveloped photographs.

Ill.Rev.Stat. ch. 38, § 11–20. No further definition of obscenity is contained in the statute or incorporated by reference. Prior to *Miller,* the Illinois Supreme Court found this definition to be constitutional, in an opinion authored by Justice Davis. *People v. Ridens,* 51 Ill.2d 410, 282 N.E.2d 691 (1972) (hereafter referred to as *"Ridens I"*).

Subsequently, the United States Supreme Court granted certiorari, vacated the judgment, and remanded the cause for consideration in light of *Miller.* On remand, *People v. Ridens,* 59 Ill.2d 362, 321 N.E.2d 264 (1974) (*"Ridens II"*), the Illinois Supreme Court said:

> We need not and do not attempt to analyze the changes from the three-part *Roth-Memoirs* standard effected by the enunciation of the three-part *Miller* standard. It suffices to, and we now construe section 11–20 of the Criminal Code . . . to incorporate parts (a) and (b) of the *Miller* standard.

59 Ill.2d at 373, 321 N.E.2d at 270. The context of the quotation clearly indicates that the (a) and (b) referred to are of the tripartite scheme, rather than the two examples, a shortcoming which was pointed out by Justice Davis, who was now the lone dissenter. 321 N.E.2d at 276.[1]

An incorporation of the *Miller* tripartite standard cannot alone satisfy *Miller's* specificity requirement. *Miller* explicitly reserved for the states the specification itself. Not every state will seek to regulate all, or even the same subset of that material which can be constitutionally treated as obscene. Indeed, the Supreme Court of the United States expressly avoided demanding the use of its particular examples as a standard or proposed regulatory scheme. *Ridens II* might have explicitly included the *Miller* examples as its own, by construction, as did the Supreme Court in *Hamling,* but *Ridens II* did not. It remained after *Ridens II* for section 11–20 to be amended either legislatively or by state judicial construction to supply the wanting specificity so that the nature of the possible obscene materials being regulated, and their distinction from protected materials, could be adequately defined. *That definition is as essential to law enforcement officials who are charged with carrying out the law, as it is*

---

1. Where the state court has supplied examples by construction, the specificity problem may be cured. *See Miller v. California,* 418 U.S. 915, 94 S.Ct. 3206, 41 L.Ed.2d 1158 (1974) (appeal dismissed for want of substantial federal question). *Accord, People v. Nissinoff,* 43 Cal. App.3d 1025, 118 Cal.Rptr. 457 (1975); *People v. Enskat,* 33 Cal.App.3d 900, 908–10, 109 Cal. Rptr. 433, 438–39 (1973), *cert. denied,* 418 U.S. 937, 94 S.Ct. 3225, 41 L.Ed.2d 1172 (1974).

*to juries* like the one in *Jenkins*, who must apply the law to a set of facts.

On the three other occasions in which the Illinois Supreme Court had to construe section 11–20, it chose not to supply the needed specificity. In *People v. Gould*, 60 Ill.2d 159, 324 N.E.2d 412 (1975), the tripartite *Miller* standard, and the two possible examples were quoted, just as they were in *Ridens II*. Reference was made to *Ridens II* for the incorporation of the *Miller* tripartite standard, and Justice Davis, dissenting, incorporated by reference his prior dissent in *Ridens II*. In *People v. Hume*, 60 Ill.2d 397, 327 N.E.2d 329 (1975), specificity was not explicitly dealt with. Finally, in an unanimous [2] opinion filed the very day that oral argument was heard in this case, the Illinois Supreme Court clearly stated that no further specifying judicial construction of section 11–20 is forthcoming:

> The defendant now argues that the statute [§ 11–20] does not sufficiently define the type of conduct whose depiction is proscribed.
>
> In *People v. Ridens*, 51 Ill.2d 410, 282 N.E.2d 691 [*Ridens I*], we affirmed the convictions of defendants who had been found guilty of violating, *inter alia,* the Illinois obscenity statute by selling obscene publications. The United States Supreme Court subsequently remanded that case and directed us to reconsider our decision in light of the principles announced in *Miller* and related decisions. (*Ridens v. Illinois,* 413 U.S. 912, 93 S.Ct. 3046, 37 L.Ed.2d 1030.) This court again affirmed the convictions and found that the Illinois obscenity statute was constitutional. (*People v. Ridens,* 59 Ill.2d 362, 321 N.E.2d 264 [*Ridens II*], cert. denied, 421 U.S. 993, 95 S.Ct. 2000, 44 L.Ed.2d 483 (hereinafter referred to as *Ridens II* ).) It was held in *Ridens II* that the obscenity statute was sufficiently clear and that it adequately informed the public of the conduct whose depiction is proscribed. We noted that the statutory definition of obscenity includes within the scope of the "prurient interest" a "shameful or morbid

interest in nudity, sex or excretion." The defendant argues that we erred in *Ridens II* in our interpretation of *Miller* and that *Miller* requires obscenity statutes to be much more specific in defining the type of material which will be considered obscene. We see no reason to reconsider our decision in *Ridens II*. It is extremely difficult to define the term "obscenity" with a fine degree of precision. *We again express our opinion* that Illinois' statutory definition is sufficiently clear to withstand constitutional objections.

*People v. Ward,* 63 Ill.2d 437, 440–441, 349 N.E.2d 47, 48–49 (1976) (emphasis added).

The similarity between section 11–20, and the California statute which was the subject of the *Miller* remand is inescapable:

> (a) 'Obscene' means that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters and is matter which is utterly without redeeming social importance.

*Miller v. California,* 413 U.S. 15, 17, 18, n. 1, 93 S.Ct. 2607, 2611, 37 L.Ed.2d 419 (1973). This court does not believe *Miller* can be properly construed as allowing the actual language of section 11–20 to be specific without the judicial engrafting of *Miller*-type examples, or other specifications such as those articulated in Justice Davis' dissent in *Ridens II*. As no such specification has been supplied by the Illinois Supreme Court, this court holds that section 11–20, as construed, is constitutionally invalid.

## IS EQUITABLE RELIEF APPROPRIATE ON BEHALF OF THE INDIVIDUAL PLAINTIFFS?

Defendants contend that under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the equitable relief requested by plaintiffs is barred by considerations of comity. As to all the individual plaintiffs, there is currently a pending crim-

---

**2.** The late Justice Davis had previously ceased to sit on the Illinois Supreme Court.

inal proceeding in the Illinois state courts. Federal interference with those proceedings can be justified only if it can be shown that the proceedings are the product of bad faith on the part of law enforcement officials, or that other extraordinary circumstances exist.

■ The gravamen of bad faith prosecutions is the lack of a reasonable expectation that valid convictions will result. Section 11–20 has been repeatedly upheld by the Illinois Supreme Court. Good faith enforcement of such a statute cannot give rise to a bad faith prosecution. The complaint, as elucidated and limited by the Voluntary Bill of Particulars (*see* section I, "Facts Upon Which The Assertion Of Official Bad Faith And Harassment Are Based") relies on: (1) the procedure to obtain warrants which authorize seizure of movies; (2) the seizure of items beyond the scope of a search warrant; (3) delay in filing charges based on material seized until after the commencement of the present lawsuit; (4) refusal to stipulate that items seized beyond the scope of the search warrants were illegally seized; (5) the use of allegedly illegally seized items for investigative purposes; (6) the filing of felony charges and request for felony bail bond for arrests under section 11–20, whose violation is a misdemeanor; (7) failure to take into custody some persons who were arrested in the course of searches; and (8) statements made by defendants and their agents.

■ The relation of these assertions to bad faith harassment is attenuated since the adoption of alternative procedures by defendants appears to have avoided any recurrence. The statements attributed to defendants, or their alleged agents, are entirely consistent with good faith prosecution, albeit somewhat vigorous. · Prosecutors have discretion to enforce state laws to the limit of their resources. No bad motive is attributable to the decision to enforce section 11–20. Seizures beyond the scope of the warrant are generally unconstitutional, and defendants have not contended (with the exception of film projectors) that any justification exists for those seizures. Only

the corporate defendant, however, has rights with respect to these seizures. The initial filing of felony charges and the request for felony bail bond on a section 11–20 misdemeanor charge is the most promising candidate to support an ultimate finding of bad faith. It is, however, an isolated occurrence. The improprieties allegedly committed, with this one exception, are either wholly consistent with good faith prosecution, or else readily redressible in the proceedings which are now pending, insofar as the individual plaintiffs are concerned. These items may nonetheless have probative value toward establishing bad faith if future events supplement them. While the court does not implicitly condone all of the practices alleged to have been carried out by defendants and their agents, we hold that the complaint, including the bill of particulars, does not make out a claim for the bad faith harassment exception as to the individual plaintiffs and that consequently, the complaint must be dismissed as to the individual plaintiffs for failure to state a claim on which relief can be granted.

## THE PROPRIETY OF EQUITABLE RELIEF FOR EAGLE BOOKS

■ Having found that Ill.Rev.Stat. ch. 38, § 11–20 is unconstitutional as construed, for failure to incorporate specific examples of obscenity, or to otherwise satisfy the specificity requirements of *Miller v. California, supra,* it remains for the court to consider what, if any, relief should be fashioned for Eagle Books, in light of this court's holding that no equitable relief is appropriate as to the individual plaintiffs. The comity considerations of *Younger v. Harris, supra,* however, ordinarily apply only when there is a pending criminal proceeding against the very plaintiff who seeks relief in federal court. Otherwise, declaratory and injunctive relief may be given on traditional grounds. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). In this particular case, the court must en-

gage in an analysis similar to one suited for determination of the existence of bad faith/extraordinary circumstances, in order to determine whether the corporate plaintiff, Eagle Books, should be treated for purposes of fashioning relief as though there in fact were a pending criminal proceeding against it.

*Doran v. Salem Inc., supra,* acknowledged the question of separating, for purposes of fashioning relief, plaintiffs in one lawsuit according to whether or not each had a pending criminal proceeding. Three corporations in a single town each operated bars. At those bars, they employed women with uncovered breasts. The town enacted an ordinance which made such employment a sufficient condition for the imposition of criminal punishment against the corporations in the form of a fine. On the effective date of the ordinance, the corporations ceased the practice, but jointly filed a complaint in federal district court to have the ordinance declared unconstitutional and to have its enforcement enjoined. The complaint requested a temporary restraining order which was denied. Subsequent to the denial, one of the three corporations temporarily resumed the practice, and became the subject of a criminal prosecution in the state court. In holding that each plaintiff must be treated separately, the court said:

> We do not agree . . . that all three plaintiffs should automatically be thrown into the same hopper for *Younger* purposes, and should thereby each be entitled to injunctive relief. We cannot accept that view, any more than we can accept petitioner's equally Procrustean view that because [plaintiff] M & L would have been barred from injunctive relief had it been the sole plaintiff, [plaintiffs] Salem and Tim-Rob should likewise be barred not only from injunctive relief but declaratory relief as well. *While there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the* Younger *considerations which govern any one of them, this is not such a case* —while respondents [plaintiffs] are represented by common counsel, and have

similar business activities and problems, they are apparently unrelated in terms of ownership, control and management. We thus think that each of the individual respondents should be placed in the position required by our cases as if that respondent stood alone.

*Id.,* at 928–29, 95 S.Ct. at 2566. (emphasis added).

█ It is apparent from this statement that the *Younger* considerations themselves are intertwined with the distinction between parties. The closer the relationship between parties, the more likely it is that the comity policies underlying *Younger* will be disrupted by federal equitable relief with respect to one when a pending criminal proceeding exists with respect to the other. In the present case, the nexus between Eagle Books and its plaintiff-employees is too substantial to allow for the categorical exclusion of consideration of comity allowed in *Steffel* and *Doran.* Similarly, the differences in the interests of the corporate and the individual defendant are too substantial to utilize the same bad faith/extraordinary circumstances criteria as would apply if a pending criminal proceeding existed with respect to Eagle Books. Although no specific exception is arrived at, the court holds that under the circumstances of this case, declaratory and injunctive relief is appropriate on behalf of Eagle Books.

Eagle Books has interests in the enforcement and validity of section 11–20 that do not equally pertain to its plaintiff-employees. First and foremost, Eagle Books operates bookstores at which, it has been conceded, communicative materials which are not obscene are kept and sold. The arrests, searches, and seizures all do great injury to Eagle Books' dissemination of these first amendment materials. The bookstores must be closed down when arrests are made. Patrons are chilled from exercising their first amendment rights by the presence of ongoing police procedures at the source of materials. And patrons of course have no access to these protected materials during the periods when the stores are closed. Moreover, the seizure of materials

and cessation of protected activity give rise to a day-to-day pecuniary loss to Eagle Books, much of which cannot be calculated. Also, Eagle Books is subject to prosecution under section 11–20. *See* Ill.Rev.Stat. ch. 38, § 2–15. The decision not to so prosecute is presumably an exercise of that same prosecutorial discretion by which some employees might be arrested, but not others.

In contrast, the interest of the persons arrested is much more limited to the particular arrest. There is no allegation that they partake of their employer's loss of income. They have no institutional role as book and film dispensers. They do have an interest in being able to carry out their present employment, which appears to subject them to repeated risk of prosecution.

Perhaps the most important reason why these differences in interests do not, by themselves, justify separate treatment is what Eagle Books has *not* done, namely it has not refrained from activity which could give rise to prosecution under an arguably unconstitutional law for the purpose of testing it in federal court, as was the case of the plaintiffs who secured relief in *Steffel* and *Doran.* Eagle Books was the employer, and in a relevant sense the controller of its employees, who did violate that law. Eagle Books, therefore, has some vicarious involvement with the pending prosecutions, and it is therefore necessary to review the policies that support *Younger.*

Given the above conclusion, the court must now decide whether the circumstances of this case nonetheless justify, in terms of comity and federalism, equitable relief. Historically, federal courts have been unwilling to interfere with the state criminal system. In *Ex parte Young,* 209 U.S. 123, 161–62, 28 S.Ct. 441, 52 L.Ed. 714 (1908), equitable relief was sanctioned against an attorney general who enforced a state criminal law (by seeking a writ of mandamus) which had been found to carry so heavy a fine that citizens and corporations might be unwilling to challenge it for fear of being subject to the penalty for even one violation. In *Fenner v. Boykin,* 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926), the Supreme Court affirmed the denial of an injunction against the enforcement of a criminal statute:

> The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it appears that this course would not afford adequate protection.

*Id.* at 244, 46 S.Ct. at 493. The injunction of state prosecutions was reserved for situations in which the "danger of irreparable loss is both great and immediate." *Id.* at 243, 46 S.Ct. at 493. These cases turn on whether or not the available state court proceeding afforded a reasonable way to challenge the allegedly unconstitutional statutes.

The boundaries of restraint of federal equitable relief against state prosecutions were further delineated in *Douglas v. City of Jeannette,* 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), in which the Supreme Court affirmed the reversal of an injunction against prosecuting under a statute which the Supreme Court that very day had declared unconstitutional. The rationale was that

> It does not appear from the record that petitioners have been threatened with any injury other than that incident to every criminal proceeding brought lawfully and in good faith, or that *a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court.*

*Id.* at 164, 63 S.Ct. at 881 (emphasis added). *Accord, Cameron v. Johnson,* 390 U.S. 611, 620, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). The nexus between good faith prosecutions and lack of irreparable injury sufficient for intervention was articulated in *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Prosecutions, arrests, searches and seizures had been allegedly undertaken, nominally pursuant to the Louisiana Subversive Activities and Communist Control Law, and the Communist Propa-

ganda Control Law, with no expectation of valid convictions. Moreover, the items seized were allegedly used to harass those engaged in particular First Amendment activities. The Court held that the complaint stated a basis for equitable relief, even though there existed a pending prosecution against plaintiffs. The basis did not arise, however, from the prospect of mistake by the prosecutor.

> "It is generally to be assumed that state courts and prosecutors will observe constitutional limitations as expounded by this Court, and that the mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings."

*Id.* at 484–85, 85 S.Ct. at 1120.

It can be seen from these cases that the bad faith exception is treated as a special class (and the only class the Supreme Court has recently viewed) of the cases in which the state proceeding is peculiarly inadequate to vindicate rights guaranteed by the federal constitution. Drawing from the facts in *Dombrowski,* there are a number of reasons why bad faith prosecutions are such appropriate occasions for an exception to the general rule against federal interference.

First, where there is no expectation of a valid conviction, proceeding through the state system, and even the Supreme Court, will not stop the launching of another arrest or law suit. The pending proceeding only offers retrospective relief and is by definition unlikely to deter the unscrupulous law enforcement agent from future transgressions. Additionally, the consequences of the arrestee's entry into the state criminal justice system may be more onerous than usual, given the expectation of bad faith. Arrests may be attended with undue publicity, for example, as was the case in *Dombrowski,* thereby resulting in an undue impairment of the First Amendment rights of the plaintiffs. More generally, the incidents to a good faith criminal prosecution are enhanced because systematic safeguards against their unjustified initiation, such as the prerequisite of probable cause for an arrest, can not be depended on. The entire social context of bad faith prosecutions must also be considered. A community, comprised mainly of those who are not the explicit victims of bad faith prosecutions, may change its behavior, particularly First Amendment exercise, because of the rash of arrests, even if those improperly motivated arrests are professionally executed, and even if no misuse of the fruits is involved. Finally, the extent of prosecutorial power is so great that its abuse[3] may have serious effect before a state proceeding ends.

The bad faith exception is harmonious with the *Younger* recitation of a "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances" 401 U.S. at 41, 91 S.Ct. at 749 (footnote omitted), with

> . . . sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States . . . .

*Id.* at 44, 91 S.Ct. at 750, and with a proper respect for state functions. However, matters which are quite capable of causing great and immediate irreparable harm are not always addressed in the pending state proceeding. Federal intervention in those instances cannot be characterized as a disregard for the competence of state court judges, or as a disregard for the overwhelming expectation that they will carry out their oaths to support the federal constitution. *See Huffman v. Pursue,* 420 U.S.

---

**3.** Where a statute itself if flagrantly unconstitutional, the same presumption of irreparability may overcome the ordinary deference to state proceedings, even though there is no reason why the state proceedings might not quickly and competently address federal constitutional claims. *Younger v. Harris,* 401 U.S. 37, 53–55, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

592, 611, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). Indeed, the bad faith exception is a recognition that where great and immediate irreparable harm will flow from continued prosecutions, and where the pending state court proceedings do not, by their nature, anticipate the injuries being done, federal courts must fulfill their role as the guarantors of the federal constitutional rights and must fashion appropriate relief. By definition, the injuries which inhere in a good faith prosecution are contemplated by the state court criminal proceeding. Also, where a different kind of state proceeding is involved, federal intervention might not be called for. *See Llewelyn v. Oakland County Prosecutor's Office,* 402 F.Supp. 1379, 1391 (E.D.Mich.1975).

Given this context, we proceed to examine the facts before us to determine if the irreparability posed by the continued enforcement of section 11–20 approaches that which has been associated with bad faith. In considering the following factors, it should be borne in mind that conditions which, by themselves, may not be sufficient to give rise to irreparable harm justifying intervention, may nonetheless be relevant to the ultimate assessment of whether the total situation presented to the court is sufficient to determine the question before it in favor of granting equitable relief. First amendment interests are at stake in this lawsuit. The prospect of continued enforcement seriously interferes with the distribution of communicative materials. It is uncontested that defendants intend to vigorously enforce the statute. While such vigor is in no way tantamount to bad faith, it does indicate that the ability to continue the first amendment activity may be increasingly, immediately and unjustifiably threatened.

In the ordinary situation, this court would give very careful deference to the prospect that the constitutional issue could be raised before the state trial court. However, no real meaningful opportunity exists for such an issue to be raised there. As discussed earlier in this opinion, the Illinois Supreme Court has had four occasions in less than three years to review the very

constitutional question raised by plaintiffs, the last occasion being on the same day that oral argument was held in this cause. Through those cases, that court has repeatedly indicated that it will not give any further specification of section 11–20 through the judicial construction contemplated by *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). State trial courts are bound by their state Supreme Court, especially where the state Supreme Court has construed a ruling by the United States Supreme Court. Consequently, in light of the *People v. Ward, supra,* announcement that section 11–20 is constitutionally specific, no Illinois trial court can be expected to give further consideration of the issue. Therefore, given the particular first amendment aspects of this matter it is evident that a federal court, by precluding some part of this matter from the state court's consideration, gives petitioner Eagle Books protection it could not secure through a prompt trial and ultimate appeal to the Supreme Court. *Cf. Douglas v. City of Jeannette, supra,* at 164, 63 S.Ct. at 877.

What confronts plaintiff Eagle Books is not that its chances of success on appeal are "inauspicious", *Huffman v. Pursue, supra,* at 610, 95 S.Ct. at 1200, or that there exists the "mere possibility of erroneous initial application of constitutional standards", *Dombrowski v. Pfister, supra,* at 484, 85 S.Ct. at 1120, but rather that there is no meaningful opportunity at all to raise its issue, which we find more than substantial, before the state court system if it were to be prosecuted.

The attack on this statute is in essence facial, although it includes not only the words written by the legislature, but also those engrafted by the Illinois Supreme Court. Because the same statute, as construed, applies to all state citizens who may engage in the first amendment activity carried out by Eagle Books and its counterparts, the federal interest is heightened. *Steffel v. Thompson,* 415 U.S. 452, 474, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). In addition we find the unconstitutionality of sec-

tion 11–20 invokes the prospect of the presumption of irreparability that would attend a flagrantly unconstitutional statute. While we do not find patent unconstitutionality to be encrusted on every part of the statute, it is noteworthy that, despite the directions of the remand of the original *Ridens* case, and despite the emphasis in *Miller* on specificity, the state has not explicitly confronted the specificity question either legislatively or judicially. The obviousness of the need for a specifying construction of section 11–20 under *Miller* enhances the irreparability attendant to the lack of a meaningful opportunity to obtain proper construction through the state court system.

Aside from the factors of irreparability, the present case at the same time contains ingredients which soften the ordinarily harsh impact on state-federal relations that attends federal intervention. The state court system has carefully considered the constitutional question raised by plaintiffs, and we respect the process by which they have achieved their result. The intervention of this court does not cast in a negative light the competence or fairness of state court judges; rather, once the state court has reflectively performed that function, no purpose, under present circumstances, is served by delaying federal consideration of the same issue through a three step process of trial, appeal, and subsequent appeal (by leave) to the Illinois Supreme Court. Moreover, the nature of the relief granted today by the court does not directly encumber any ongoing prosecution. *Cf. Hicks v. Miranda,* 420 U.S. 920, 95 S.Ct. 1113, 43 L.Ed.2d 390 (1975).

*CONCLUSION*

There is no present criminal proceeding pending against plaintiff Eagle Books. It is therefore, unnecessary to decide whether the present circumstances give rise to the same level of irreparability as is associated with a bad faith prosecution or "extraordinary" circumstances. We do find, however, that Eagle Books has shown, without contest, serious irreparable injury in the face

of threatened enforcement of the statute which entails seizures of its materials and arrests of its employees. In view of the current state law, declaratory relief by itself would not seem to be adequate, *Cf. Ex Parte Young, supra,* since law enforcement persons have a duty to enforce section 11–20. Accordingly, the court hereby declares that section 11–20 is violative of the fourteenth amendment of the Constitution, and that defendants are hereafter enjoined from enforcing section 11–20 as presently construed, on the premises of the two bookstores owned by Eagle Books and from prosecuting Eagle Books for violation of section 11–20. Particularly, future arrests and seizures of materials pursuant to the present section 11–20 can no longer be authorized or carried out with respect to those premises.