POLEN, J.
Appellant, Vincent Puglisi, appeals the trial court’s order adjudicating him guilty of first degree murder (Count I) and armed robbery (Count II) and sentencing him to life imprisonment without parole as to Count I and thirty years imprisonment as to Count II, to run concurrently. This court has jurisdiction. Fla. R.App. P. 9.140(b)(1)(A).
Puglisi and his co-defendant, Rex Ditto, were charged with first degree murder and armed robbery for events occurring on February 5, 2006. Following a jury trial, Puglisi was found guilty as charged. Having thoroughly reviewed the record, we hold that none of the errors complained of by Puglisi on appeal warrants reversal by this court.
At a hearing on Puglisi’s motion to suppress statements and physical evidence, *789 Officer Christopher Crawford of the Boyn-ton Beach Police Department testified regarding his investigation of the death of Alan Shalleck. While at the crime scene (Shalleck’s mobile home) on February 7, 2006, Crawford found that Puglisi had recently called Shalleck’s phone. Crawford contacted Puglisi, told him he found Pugli-si’s number in Shalleck’s phone and that Crawford was investigating an incident that occurred with Shalleck. Crawford did not say Shalleck had been murdered. Pu-glisi suggested that Crawford meet him at his place of work, Chook’s Chicken, at 4:00 p.m. the following day.
The next day, Crawford and Investigator Brian Anderson went together to Chook’s Chicken, which was located in Broward County. Crawford and Anderson travelled in Anderson’s unmarked police car which looks like a normal civilian car. The officers were dressed in civilian dress clothing. Crawford introduced himself and Anderson to Puglisi and explained that they were investigating the death of Shal-leck and asked whether Puglisi would be willing to help them with the investigation. Puglisi replied that he would come and speak with the investigators so long as his boss was okay with him leaving work. After gaining the employer’s permission, Pu-glisi accompanied the officers back to the Boynton Beach Police Department.
Both Crawford and Puglisi’s employer testified that, at all times, Crawford’s tone was conversational. There was no physical contact between the officers and Pugli-si and Puglisi acted on his own free will in leaving with the officers and interacting with them. Puglisi was with the officers for the remainder of the day and that night was placed under arrest for the murder of Shalleck after Ditto implicated Puglisi and Puglisi himself confessed. Before an initial interview, Crawford read Puglisi his Miranda[1] warnings from a Boynton Beach Police Department Miranda card, and Pu-glisi stated he understood his rights and signed the card. Before a subsequent interview later that evening, Crawford confirmed that Puglisi understood his rights and still wanted to give a statement to the police.
In his first tape recorded statement, Pu-glisi explained that he had met Shalleck about a year earlier through an ad in a gay magazine. Both Shalleck and Puglisi were gay and had a casual sexual relationship until about a month or two before Shal-leck’s death. Shalleck invited Puglisi to come over on Super Bowl Sunday, but Puglisi declined. Instead, Puglisi said he worked on Super Bowl Sunday until about 8:00 p.m. and then went to a restaurant with Rex Ditto, 29, whom Puglisi was dating. Puglisi said he and Ditto went to Puglisi’s home after the game ended and spent the night together. When the officers told Puglisi that Shalleck had been murdered in his home, Puglisi responded that Ditto could have done something like that. Puglisi had seen Ditto cleaning the front seat of a Ford Explorer with bleach on February 6 and also saw Ditto burning clothing, keys, documents, and the like on that night.
In a second tape-recorded statement, taken after Ditto confessed and implicated Puglisi in his confession, Puglisi confessed to taking part in the murder. Puglisi told Crawford that he had arranged to meet Shalleck around 11:30 pm. on Super Bowl Sunday. After having dinner with Ditto and watching the game, Puglisi and Ditto drove to Shalleck’s home in Puglisi’s vehicle. When they arrived, they went inside and watched TV. After a while, Shalleck told Ditto he wanted to have sex with him and asked him to go in his bedroom and *790 undress. Ditto returned wearing nothing but his underwear. Ditto laid across Shal-leck’s lap and Shalleck pulled off his underwear and spanked him.
Shalleck told Ditto to go back into his bedroom and Shalleck followed. Shalleck called Puglisi into the room, and when Puglisi walked in he saw Shalleck performing oral sex on Ditto. Ditto “freaked out” and began strangling Shalleck. Ditto asked Puglisi to help him. Ditto pushed Shalleck to the floor and started beating him in the head with a paddle. Blood covered the paddle and was “going everywhere.” Ditto asked Puglisi to hold Shal-leck down, and Puglisi took a pillow and held it over Shalleck’s face. Ditto told Puglisi he was going to the kitchen to get a knife and soon returned with a knife and began stabbing Shalleck repeatedly. Pu-glisi estimated that Ditto stabbed Shalleck a hundred times. The first knife broke, and Ditto went to the kitchen to get another knife. Ditto returned to the bedroom and stabbed Shalleck until that knife broke too. When Ditto left to get a third knife, Puglisi left the room because he could no longer watch. Puglisi never stabbed Shal-leck himself because he did not “have the nerve” to do it.
After Puglisi left the room, Ditto eventually came out and told Puglisi that Shal-leck was dead. Ditto suggested dumping Shalleck’s body in Alligator Alley. The men put the body in two garbage bags and dragged him to the car, but Shalleck was too heavy for the men to lift into the car. The men left Shalleck’s body in the driveway.
The men put the paddle and the knife in a garbage bag to take with them. The men also took a Fossil watch and a ring and some change from the house. Ditto wrote himself a check in the amount of $450 from Shalleck’s checkbook. The men pawned the ring, and Ditto kept the watch for himself. Puglisi and Ditto had discussed robbing Shalleck while they were at dinner. According to Puglisi, that was Ditto’s plan. Puglisi later threw the garbage bag containing the knives in the in-tracoastal in Fort Lauderdale. Puglisi stated that he was in love with Ditto and went along -with Ditto’s plan to rob and kill Shalleck because he did not “realize the seriousness of the consequences.”
Investigator Anderson reiterated most of Crawford’s testimony regarding their initial meeting with Puglisi, the manner of contact, and their time together in the police vehicle and at the police station. Anderson patted Puglisi down prior to entering the interrogation room with him for purposes of officer safety.
The trial court denied the motion, on the grounds that Puglisi was not in custody when he spoke to the police and his statements and consent were voluntarily and knowingly given. Puglisi’s renewed objection to admission of the evidence at trial was overruled.
In addition to the evidence adduced at the hearing on the motion to suppress, the following was proven during trial. On Monday, February 6, 2006, the day after the Super Bowl, a maintenance man at the Royal Manor Mobile Home Park noticed some trash bags on the driveway at a residence. When the bags had not been moved the next day, he investigated and discovered Shalleck’s body beneath the bags. He had been stabbed thirty-seven times and died as a result of multiple stab wounds and blunt head trauma. Some injuries to his face could have been consistent with having been caused by having a pillow pressed against him, but they were not a cause of death.
Police found blood inside the master bedroom and master bath of the home, as well as a couple of broken knife blades and *791 broken glass. Over defense objection, the State introduced thirteen photographs of the bloody scene. A video of the crime scene was also shown to the jury.
Joseph Carney, a friend of Puglisi’s, visited him in jail several times after his arrest. Puglisi initially told Carney that he had nothing to do with the killing, but later he admitted to being present. Carney went to a jewelry store Puglisi told him about, where he found Shalleck’s ring which had been pawned. On Carney’s last visit with Puglisi, he told Puglisi that he did not believe his protestations of innocence. Puglisi became upset and angrily told Carney “I killed the old son of a bitch, now what do you want out of me.” Puglisi then began crying.
The trash bags covering Shalleck’s body were similar to a trash bag brought from Puglisi’s place of work. Eyeglasses taken from Rex Ditto had blood stains on one of the lenses. A handwriting expert testified that the handwriting on the check written on Shalleck’s account and directions to Shalleck’s home were written by Puglisi. A DNA expert testified that the only DNA samples found at the scene of the homicide for which Puglisi could not be excluded were those found on a pillow.
During trial, the State learned during an interview of Michael Zimmerman, who had shared a cell with Ditto, that Ditto claimed he was solely responsible for the murder and that Puglisi had done nothing. Accordingly, the State served its Brady[2] Notice on June 23, 2008, in which it provided notice of the following facts:
1.On June 21, 2008, the State took the deposition of Michael Zimmerman who stated that on June 12, 2008, he was in a holding cell with Rex Ditto and that Ditto told him that he was brought down by the State to testify against Puglisi. He stated however that he would say that he did everything and that Puglisi did nothing.
2. After this deposition, the undersigned, and State Attorney Investigator William [Fraser], went to the Palm Beach County Sheriffs Office and met with Rex Ditto. When confronted with Zimmerman’s statement, Ditto acknowledged the statement to Zimmerman and that the statement was true. He said that he made his original statements to avoid getting the death penalty.
3. When asked how he would testify if called by either side to the witness stand, he stated that he would probably lie and testify consistently with his previous statements.
During a hearing on June 23, 2008, defense counsel moved for a mistrial in light of the new information regarding Ditto’s testimony. The State advised the court of the history of inconsistent statements by Ditto and explained that defense counsel knew of the inconsistencies as of October 2007— Ditto had been changing his story for some time.
The record indicated that between October 2007 and the time of trial, Ditto had repeatedly changed his version of events. Prior to entering a plea of guilty, Ditto stated that he was completely to blame for the murder and that Puglisi was not involved. That information was provided to Puglisi’s defense counsel at that time. Ditto later told the State he had lied in his previous statement, and that if he was called to testify he would explain that both he and Puglisi participated in significant acts which caused the death of Shalleck. The State did not call Ditto because he was not credible. The State argued that defense counsel had access to Ditto and knew of his change in story long before *792 trial — if defense counsel wanted to call him as a witness, they did so at their own risk.
Defense counsel informed the court that Zimmerman had stated that Ditto made like statements back in 2006. Counsel acknowledged that Ditto made various statements, but wanted to focus on the fact that Ditto had explained that his prior statements implicating Puglisi were made in an effort to avoid the death penalty. The State responded that Ditto implicated Pu-glisi to the police before he ever knew the death penalty was a possibility in his case. The court denied the motion for mistrial but allowed defense counsel to depose Ditto once more before deciding whether to call'him as a witness.
Following Ditto’s deposition, defense counsel renewed its motion for mistrial and advised the court that Ditto had taken all the blame for the murder and maintained that Puglisi was merely present. Counsel explained that Ditto stated in a February 2008 deposition that both men were responsible for the murder and that, until the State’s Brady notice, she had no reason to believe Ditto would testify any differently. In order to be able to call Ditto, defense counsel needed to conduct an advanced investigation so a jury could know the entire picture of Ditto’s testimony. The trial court denied the motion for mistrial and remained in recess until the following morning in an effort to give defense counsel time to gather witnesses who would corroborate Ditto’s most recent account.
The following morning, defense counsel advised the court they would not call Ditto as a witness. Puglisi stated that he would like to call Ditto and reiterated that he and his attorneys disagree often. Puglisi told the court that he believed he had nothing to lose by calling Ditto. The court ultimately refused to allow Puglisi to call Ditto as a witness and explained to Puglisi that he had excellent attorneys who had discussed at length the issue of whether to call Ditto. Puglisi did not put on any witnesses. Following deliberation, the jury found Puglisi guilty as charged.
Puglisi first contends the trial court erred in refusing to allow him to call Ditto as a witness despite defense counsel’s determination that calling Ditto would not be of benefit to Puglisi’s case. On this point, we find the decision of United States v. Burke, 257 F.3d 1321 (11th Cir.2001), particularly instructive:
The Supreme Court has said that a defendant has the ultimate authority to make fundamental decisions for his case. The Court has listed four decisions which it characterizes as fundamental: whether to plead guilty, waive a jury, testify in his or her own behalf or to take an appeal. See Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). But this list is all the Supreme Court has said about fundamental rights that belong solely to the defendant for decision.
... [W]e decline to expand the circumstances that erode defense counsel’s authority at trial. Defense counsel in a criminal trial is more than an adviser to a client with the client’s having the final say at each point. He is an officer of the court and a professional advocate pursuing a result-almost always, acquittal-within the confines of the law; his chief reason for being present is to exercise his professional judgment to decide tactics.
Federal courts are “forever adding new stories to the temples of constitutional law, and the temples have a way of collapsing when one story too many is added.” Douglas v. Jeannette, 319 U.S. 157, 63 S.Ct. 877, 879, 87 L.Ed. 1324 (1943) (Jackson, J., concurring in part and dissenting in part). When the de *793 fendant is given the last word about how his case will be tried, the defendant becomes his own trial lawyer. If we add to the list of circumstances in which a defendant can trump his counsel’s decision, the adversarial system becomes less effective as the opinions of lay persons are substituted for the judgment of legally trained counsel. The sound functioning of the adversarial system is critical to the American system of criminal justice. We intend to defend it.
Id. at 1323. Determining which witnesses should be called by the defense is not a fundamental decision to be made by the defendant himself. The trial court properly denied Puglisi’s demands that Ditto be called to testify because such a decision is better made by a professional advocate who is considering not just what the anticipated testimony might be, but issues of credibility and potential harm to the defendant as well.
Relying primarily on Blanco v. State, 452 So.2d 520 (Fla.1984), Puglisi maintains that Florida law holds that the ultimate decision of whom to call as a witness is to be made by the defendant. In Blanco, the trial court allowed the defendant to call witnesses against defense counsel’s advice when defendant insisted on calling them even after defense counsel’s repeated warnings that such a decision was not in his best interest. Id. at 524. On appeal, the defendant argued the trial court erred by allowing him to call the witnesses, and the Florida Supreme Court determined that, under the circumstances, defendant could not be heard to complain of error on appeal. Id. The court held that which witnesses are called on a defendant’s behalf ultimately is the defendant’s decision. Id. (relying on Milligan v. State, 177 So.2d 75 (Fla. 2d DCA 1965)). We find Blanco inapposite. The Supreme Court’s holding that the trial court allowing defendant to call the witnesses in Blanco did not constitute reversible error does not mean that the trial court’s refusal to allow Puglisi to call Ditto in the instant case is reversible error.
As to Puglisi’s argument that the trial court erred in denying defense counsel’s motion for a continuance after the State announced new evidence that Ditto made exculpatory statements about Pugli-si, we are unconvinced. A trial court’s ruling on a motion for continuance is reviewed for an abuse of discretion. Porter v. State, 736 So.2d 716, 717 (Fla. 2d DCA 1999). An abuse of discretion is generally not found unless the trial court’s ruling results in undue prejudice to the defendant. D.N. v. State, 855 So.2d 258, 260 (Fla. 4th DCA 2003). The record shows that defense counsel knew Ditto had changed his account of the murder numerous times between his arrest and Puglisi’s trial. There was no surprise to defense counsel, and thus, the trial court did not abuse its discretion in denying the motion for continuance.
Puglisi contends the trial court erred in denying his motion to suppress statements because a reasonable person treated as Puglisi would have felt his liberty was constrained. “In reviewing an order on a motion to suppress, an appellate court should defer to the trial court’s factual findings but review de novo the application of the law to the facts.” Dixon v. State, 36 So.3d 920, 923 (Fla. 4th DCA 2010). Officers Crawford and Anderson, and Puglisi’s employer offered competent substantial evidence that Puglisi cooperated with the police of his own accord. Pu-glisi set up the time and place for the initial meeting. Puglisi agreed to assist the officers in their investigation as long as it was okay with his employer. Crawford and Anderson’s tone remained conversational and informal throughout the encounter. There was never any physical contact *794 between the officers and Puglisi. Puglisi also signed several consent forms allowing the officers to take his fingerprints, his DNA, search his home, and search his vehicle. On this record, the trial court was correct in denying Puglisi’s motion to suppress.
Finally, Puglisi asks this court to reverse and remand for a new trial because the trial court abused its discretion in admitting photographs which had little probative value and were intended to inflame the jury. Admission of photographs is within the discretion of the trial court and will not be overturned on appeal absent a clear abuse of that discretion. Bates v. State, 3 So.3d 1091, 1107 (Fla.2009). Relevancy, not necessity, is the test for admissibility of photographs into evidence. Welch v. State, 992 So.2d 206, 216 (Fla.2008) (citations omitted). Even if the photographs are relevant, the trial court must determine whether the portrayal is so gruesome and inflammatory that it creates an undue prejudice in the minds of the jurors. Id. at 216. The photographs at issue depicted blood spatter in two different rooms — the master bedroom and bathroom — indicating the murder occurred in two different rooms. Thus, the pictures were relevant to show premeditation.
For the foregoing reasons, we affirm Puglisi’s judgment and sentence. As to any other issues raised by Puglisi on appeal, we are unconvinced.

Affirmed.

WARNER and FARMER, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).